# MUEHLER ET AL. v. MENA

No. 03–1423.  Argued December 8, 2004—Decided March 22, 2005

REHNQUIST, C. J., delivered the opinion of the Court, in which O'CONNOR, SCALIA, KENNEDY, and THOMAS, JJ., joined. KENNEDY, J., filed a concurring opinion, *post*, p. 102. STEVENS, J., filed an opinion concurring in the judgment, in which SOUTER, GINSBURG, and BREYER, JJ., joined, *post*, p. 104.

*Carter G. Phillips* argued the cause for petitioners. With him on the briefs were *Joseph R. Guerra* and *David H. Hirsch.*

*Kannon K. Shanmugam* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Acting Solicitor General Clement, Assistant Attorney General Wray,* and *Deputy Solicitor General Dreeben.*

*Paul L. Hoffman* argued the cause for respondent. With him on the brief were *Benjamin Schonbrun, Michael S. Morrison,* and *Erwin Chemerinsky.**

---

**Richard Ruda* and *James I. Crowley* filed a brief for the National League of Cities et al. as *amici curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed for the American Civil Liberties Union et al. by *Mark D. Rosenbaum, Ahilan T. Arulanan-*

CHIEF JUSTICE REHNQUIST delivered the opinion of the Court.

Respondent Iris Mena was detained in handcuffs during a search of the premises that she and several others occupied. Petitioners were lead members of a police detachment executing a search warrant of these premises. She sued the officers under Rev. Stat. § 1979, 42 U. S. C. § 1983, and the District Court found in her favor. The Court of Appeals affirmed the judgment, holding that the use of handcuffs to detain Mena during the search violated the Fourth Amendment and that the officers' questioning of Mena about her immigration status during the detention constituted an independent Fourth Amendment violation. *Mena* v. *Simi Valley*, 332 F. 3d 1255 (CA9 2003). We hold that Mena's detention in handcuffs for the length of the search was consistent with our opinion in *Michigan* v. *Summers*, 452 U. S. 692 (1981), and that the officers' questioning during that detention did not violate her Fourth Amendment rights.

\*    \*    \*

Based on information gleaned from the investigation of a gang-related, driveby shooting, petitioners Muehler and Brill had reason to believe at least one member of a gang—the West Side Locos—lived at 1363 Patricia Avenue. They also suspected that the individual was armed and dangerous, since he had recently been involved in the driveby shooting. As a result, Muehler obtained a search warrant for 1363 Patricia Avenue that authorized a broad search of the house and premises for, among other things, deadly weapons and

tham, Steven R. Shapiro, Lucas Guttentag, and Lee Gelernt; and for the National Association of Criminal Defense Lawyers by Henk Brands and Pamela Harris.

Briefs of *amici curiae* were filed for the National Latino Officers Association et al. by *Baher Azmy, Lawrence S. Lustberg,* and *Jonathan L. Hafetz;* and for the Police Officers Research Association of California Legal Defense Fund et al. by *Michael J. Hansen.*

evidence of gang membership. In light of the high degree of risk involved in searching a house suspected of housing at least one, and perhaps multiple, armed gang members, a Special Weapons and Tactics (SWAT) team was used to secure the residence and grounds before the search.

At 7 a.m. on February 3, 1998, petitioners, along with the SWAT team and other officers, executed the warrant. Mena was asleep in her bed when the SWAT team, clad in helmets and black vests adorned with badges and the word "POLICE," entered her bedroom and placed her in handcuffs at gunpoint. The SWAT team also handcuffed three other individuals found on the property. The SWAT team then took those individuals and Mena into a converted garage, which contained several beds and some other bedroom furniture. While the search proceeded, one or two officers guarded the four detainees, who were allowed to move around the garage but remained in handcuffs.

Aware that the West Side Locos gang was composed primarily of illegal immigrants, the officers had notified the Immigration and Naturalization Service (INS) that they would be conducting the search, and an INS officer accompanied the officers executing the warrant. During their detention in the garage, an officer asked for each detainee's name, date of birth, place of birth, and immigration status. The INS officer later asked the detainees for their immigration documentation. Mena's status as a permanent resident was confirmed by her papers.

The search of the premises yielded a .22 caliber handgun with .22 caliber ammunition, a box of .25 caliber ammunition, several baseball bats with gang writing, various additional gang paraphernalia, and a bag of marijuana. Before the officers left the area, Mena was released.

In her § 1983 suit against the officers she alleged that she was detained "for an unreasonable time and in an unreasonable manner" in violation of the Fourth Amendment. App.

19. In addition, she claimed that the warrant and its execution were overbroad, that the officers failed to comply with the "knock and announce" rule, and that the officers had needlessly destroyed property during the search. The officers moved for summary judgment, asserting that they were entitled to qualified immunity, but the District Court denied their motion. The Court of Appeals affirmed that denial, *except* for Mena's claim that the warrant was overbroad; on this claim the Court of Appeals held that the officers were entitled to qualified immunity. *Mena* v. *Simi Valley*, 226 F. 3d 1031 (CA9 2000). After a trial, a jury, pursuant to a special verdict form, found that Officers Muehler and Brill violated Mena's Fourth Amendment right to be free from unreasonable seizures by detaining her both with force greater than that which was reasonable and for a longer period than that which was reasonable. The jury awarded Mena $10,000 in actual damages and $20,000 in punitive damages against each petitioner for a total of $60,000.

The Court of Appeals affirmed the judgment on two grounds. 332 F. 3d 1255 (CA9 2003). Reviewing the denial of qualified immunity *de novo*, *id.*, at 1261, n. 2, it first held that the officers' detention of Mena violated the Fourth Amendment because it was objectively unreasonable to confine her in the converted garage and keep her in handcuffs during the search, *id.*, at 1263–1264. In the Court of Appeals' view, the officers should have released Mena as soon as it became clear that she posed no immediate threat. *Id.*, at 1263. The court additionally held that the questioning of Mena about her immigration status constituted an independent Fourth Amendment violation. *Id.*, at 1264–1266. The Court of Appeals went on to hold that those rights were clearly established at the time of Mena's questioning, and thus the officers were not entitled to qualified immunity. *Id.*, at 1266–1267. We granted certiorari, 542 U. S. 903 (2004), and now vacate and remand.

*　　*　　*

In *Michigan* v. *Summers*, 452 U. S. 692 (1981), we held that officers executing a search warrant for contraband have the authority "to detain the occupants of the premises while a proper search is conducted." *Id.*, at 705. Such detentions are appropriate, we explained, because the character of the additional intrusion caused by detention is slight and because the justifications for detention are substantial. *Id.*, at 701–705. We made clear that the detention of an occupant is "surely less intrusive than the search itself," and the presence of a warrant assures that a neutral magistrate has determined that probable cause exists to search the home. *Id.*, at 701. Against this incremental intrusion, we posited three legitimate law enforcement interests that provide substantial justification for detaining an occupant: "preventing flight in the event that incriminating evidence is found"; "minimizing the risk of harm to the officers"; and facilitating "the orderly completion of the search," as detainees' "self-interest may induce them to open locked doors or locked containers to avoid the use of force." *Id.*, at 702–703.

Mena's detention was, under *Summers*, plainly permissible.[1] An officer's authority to detain incident to a search is categorical; it does not depend on the "quantum of proof justifying detention or the extent of the intrusion to be imposed by the seizure." *Id.*, at 705, n. 19. Thus, Mena's detention for the duration of the search was reasonable under *Summers* because a warrant existed to search 1363 Patricia Avenue and she was an occupant of that address at the time of the search.

Inherent in *Summers*' authorization to detain an occupant of the place to be searched is the authority to use reasonable

---

[1] In determining whether a Fourth Amendment violation occurred we draw all reasonable factual inferences in favor of the jury verdict, but as we made clear in *Ornelas* v. *United States*, 517 U. S. 690, 697–699 (1996), we do not defer to the jury's legal conclusion that those facts violate the Constitution.

force to effectuate the detention. See *Graham* v. *Connor*, 490 U. S. 386, 396 (1989) ("Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it"). Indeed, *Summers* itself stressed that the risk of harm to officers and occupants is minimized "if the officers routinely exercise unquestioned command of the situation." 452 U. S., at 703.

The officers' use of force in the form of handcuffs to effectuate Mena's detention in the garage, as well as the detention of the three other occupants, was reasonable because the governmental interests outweigh the marginal intrusion. See *Graham, supra,* at 396–397. The imposition of correctly applied handcuffs on Mena, who was already being lawfully detained during a search of the house, was undoubtedly a separate intrusion in addition to detention in the converted garage.[2] The detention was thus more intrusive than that which we upheld in *Summers.* See 452 U. S., at 701–702 (concluding that the additional intrusion in the form of a detention was less than that of the warrant-sanctioned search); *Maryland* v. *Wilson,* 519 U. S. 408, 413–414 (1997) (conclud-

---

[2] In finding the officers should have released Mena from the handcuffs, the Court of Appeals improperly relied upon the fact that the warrant did not include Mena as a suspect. See *Mena* v. *Simi Valley,* 332 F. 3d 1255, 1263, n. 5 (CA9 2003). The warrant was concerned not with individuals but with locations and property. In particular, the warrant in this case authorized the search of 1363 Patricia Avenue and its surrounding grounds for, among other things, deadly weapons and evidence of street gang membership. In this respect, the warrant here resembles that at issue in *Michigan* v. *Summers,* 452 U. S. 692 (1981), which allowed the search of a residence for drugs without mentioning any individual, including the owner of the home whom police ultimately arrested. See *People* v. *Summers,* 407 Mich. 432, 440–443, 286 N. W. 2d 226, 226–227 (1979), rev'd, *Michigan* v. *Summers, supra. Summers* makes clear that when a neutral magistrate has determined police have probable cause to believe contraband exists, "[t]he connection of an occupant to [a] home" alone "justifies a detention of that occupant." 452 U. S., at 703–704.

ing that the additional intrusion from ordering passengers out of a car, which was already stopped, was minimal).

But this was no ordinary search. The governmental interests in not only detaining, but using handcuffs, are at their maximum when, as here, a warrant authorizes a search for weapons and a wanted gang member resides on the premises. In such inherently dangerous situations, the use of handcuffs minimizes the risk of harm to both officers and occupants. Cf. *Summers, supra,* at 702–703 (recognizing the execution of a warrant to search for drugs "may give rise to sudden violence or frantic efforts to conceal or destroy evidence"). Though this safety risk inherent in executing a search warrant for weapons was sufficient to justify the use of handcuffs, the need to detain multiple occupants made the use of handcuffs all the more reasonable. Cf. *Maryland* v. *Wilson, supra,* at 414 (noting that "danger to an officer from a traffic stop is likely to be greater when there are passengers in addition to the driver in the stopped car").

Mena argues that, even if the use of handcuffs to detain her in the garage was reasonable as an initial matter, the duration of the use of handcuffs made the detention unreasonable. The duration of a detention can, of course, affect the balance of interests under *Graham.* However, the 2- to 3-hour detention in handcuffs in this case does not outweigh the government's continuing safety interests. As we have noted, this case involved the detention of four detainees by two officers during a search of a gang house for dangerous weapons. We conclude that the detention of Mena in handcuffs during the search was reasonable.

The Court of Appeals also determined that the officers violated Mena's Fourth Amendment rights by questioning her about her immigration status during the detention. 332 F. 3d, at 1264–1266. This holding, it appears, was premised on the assumption that the officers were required to have independent reasonable suspicion in order to question Mena concerning her immigration status because the questioning

constituted a discrete Fourth Amendment event. But the premise is faulty. We have "held repeatedly that mere police questioning does not constitute a seizure." *Florida* v. *Bostick,* 501 U. S. 429, 434 (1991); see also *INS* v. *Delgado,* 466 U. S. 210, 212 (1984). "[E]ven when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual; ask to examine the individual's identification; and request consent to search his or her luggage." *Bostick, supra,* at 434–435 (citations omitted). As the Court of Appeals did not hold that the detention was prolonged by the questioning, there was no additional seizure within the meaning of the Fourth Amendment. Hence, the officers did not need reasonable suspicion to ask Mena for her name, date and place of birth, or immigration status.

Our recent opinion in *Illinois* v. *Caballes,* 543 U. S. 405 (2005), is instructive. There, we held that a dog sniff performed during a traffic stop does not violate the Fourth Amendment. We noted that a lawful seizure "can become unlawful if it is prolonged beyond the time reasonably required to complete that mission," but accepted the state court's determination that the duration of the stop was not extended by the dog sniff. *Id.,* at 407. Because we held that a dog sniff was not a search subject to the Fourth Amendment, we rejected the notion that "the shift in purpose" "from a lawful traffic stop into a drug investigation" was unlawful because it "was not supported by any reasonable suspicion." *Id.,* at 408. Likewise here, the initial *Summers* detention was lawful; the Court of Appeals did not find that the questioning extended the time Mena was detained. Thus no additional Fourth Amendment justification for inquiring about Mena's immigration status was required.[3]

---

[3] The Court of Appeals' reliance on *United States* v. *Brignoni-Ponce,* 422 U. S. 873 (1975), is misplaced. *Brignoni-Ponce* held that stops by roving patrols near the border "may be justified on facts that do not amount to

In summary, the officers' detention of Mena in handcuffs during the execution of the search warrant was reasonable and did not violate the Fourth Amendment. Additionally, the officers' questioning of Mena did not constitute an independent Fourth Amendment violation. Mena has advanced in this Court, as she did before the Court of Appeals, an alternative argument for affirming the judgment below. She asserts that her detention extended beyond the time the police completed the tasks incident to the search. Because the Court of Appeals did not address this contention, we too decline to address it. See *Pierce County* v. *Guillen*, 537 U. S. 129, 148, n. 10 (2003); *National Collegiate Athletic Assn.* v. *Smith*, 525 U. S. 459, 469–470 (1999).

The judgment of the Court of Appeals is therefore vacated, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE KENNEDY, concurring.

I concur in the judgment and in the opinion of the Court. It does seem important to add this brief statement to help ensure that police handcuffing during searches becomes neither routine nor unduly prolonged.

The safety of the officers and the efficacy of the search are matters of first concern, but so too is it a matter of first concern that excessive force is not used on the persons detained, especially when these persons, though lawfully detained under *Michigan* v. *Summers*, 452 U. S. 692 (1981), are not themselves suspected of any involvement in criminal

---

the probable cause require[ment] for an arrest." *Id.*, at 880. We considered only whether the patrols had the "authority to *stop* automobiles in areas near the Mexican border," *id.*, at 874 (emphasis added), and expressed no opinion as to the appropriateness of questioning when an individual was already seized. See *United States* v. *Martinez-Fuerte*, 428 U. S. 543, 556–562 (1976). We certainly did not, as the Court of Appeals suggested, create a "requirement of particularized reasonable suspicion for purposes of inquiry into citizenship status." 332 F. 3d, at 1267.

activity. The use of handcuffs is the use of force, and such force must be objectively reasonable under the circumstances, *Graham* v. *Connor*, 490 U. S. 386 (1989).

The reasonableness calculation under *Graham* is in part a function of the expected and actual duration of the search. If the search extends to the point when the handcuffs can cause real pain or serious discomfort, provision must be made to alter the conditions of detention at least long enough to attend to the needs of the detainee. This is so even if there is no question that the initial handcuffing was objectively reasonable. The restraint should also be removed if, at any point during the search, it would be readily apparent to any objectively reasonable officer that removing the handcuffs would not compromise the officers' safety or risk interference or substantial delay in the execution of the search. The time spent in the search here, some two to three hours, certainly approaches, and may well exceed, the time beyond which a detainee's Fourth Amendment interests require revisiting the necessity of handcuffing in order to ensure the restraint, even if permissible as an initial matter, has not become excessive.

That said, under these circumstances I do not think handcuffing the detainees for the duration of the search was objectively unreasonable. As I understand the record, during much of this search 2 armed officers were available to watch over the 4 unarmed detainees, while the other 16 officers on the scene conducted an extensive search of a suspected gang safe house. Even if we accept as true—as we must—the factual assertions that these detainees posed no readily apparent danger and that keeping them handcuffed deviated from standard police procedure, it does not follow that the handcuffs were unreasonable. Where the detainees outnumber those supervising them, and this situation could not be remedied without diverting officers from an extensive, complex, and time-consuming search, the continued use of handcuffs after the initial sweep may be justified, subject to

adjustments or temporary release under supervision to avoid pain or excessive physical discomfort. Because on this record it does not appear the restraints were excessive, I join the opinion of the Court.

JUSTICE STEVENS, with whom JUSTICE SOUTER, JUSTICE GINSBURG, and JUSTICE BREYER join, concurring in the judgment.

The jury in this case found that the two petitioners violated Iris Mena's Fourth Amendment right to be free from unreasonable seizure by detaining her with greater force and for a longer period of time than was reasonable under the circumstances. In their post-trial motion in the District Court, petitioners advanced three legal arguments: (1) They were entitled to qualified immunity because the unconstitutionality of their conduct was not clearly established;[1] (2) the judge's instruction to the jury was erroneous;[2] and (3) the evidence was not sufficient to support the jury's award of

---

[1] The Court of Appeals' conclusion that the officers were not entitled to qualified immunity was not challenged in the petition for certiorari and is therefore waived. See *Taylor* v. *Freeland & Kronz*, 503 U. S. 638, 645–646 (1992).

[2] The trial judge instructed the jury as follows:

"'Generally, a police officer carrying out a search authorized by a warrant may detain occupants of the residence during the search, so long as the detention is reasonable.

"'In determining the reasonableness of a detention conducted in connection with a search, you may look to all the circumstances, including the severity of the suspected crime, whether the person being detained is the subject of the investigation, whether such person poses an immediate threat to the security of the police or others or to the ability of the police to conduct the search, and whether such person is actively resisting arrest or attempting to flee. A detention may be unreasonable if it is unnecessarily painful, degrading, prolonged or if it involves an undue invasion of privacy. A police officer is required to release an individual detained in connection with a lawful search as soon as the officers' right to conduct the search ends or the search itself is concluded, whichever is sooner.'" *Mena* v. *Simi Valley*, 332 F. 3d 1255, 1267–1268 (CA9 2003) (alterations omitted; one paragraph break added).

punitive damages. The trial judge's thoughtful explanation of his reasons for denying the motion does not address either of the issues the Court discusses today.

In its opinion affirming the judgment, the Court of Appeals made two mistakes. First, as the Court explains, *ante*, at 100–101, it erroneously held that the immigration officers' questioning of Mena about her immigration status was an independent violation of the Fourth Amendment.[3] Second, instead of merely deciding whether there was sufficient evidence in the record to support the jury's verdict, the Court of Appeals appears to have ruled as a matter of law that the officers should have released her from the handcuffs sooner than they did. I agree that it is appropriate to remand the case to enable the Court of Appeals to consider whether the evidence supports Mena's contention that she was held longer than the search actually lasted. In doing so, the Court of Appeals must of course accord appropriate deference to the jury's reasonable factual findings, while applying the correct legal standard. See *Ornelas* v. *United States*, 517 U. S. 690, 699 (1996).

In my judgment, however, the Court's discussion of the amount of force used to detain Mena pursuant to *Michigan* v. *Summers*, 452 U. S. 692 (1981), is analytically unsound. Although the Court correctly purports to apply the "objective reasonableness" test announced in *Graham* v. *Connor*, 490 U. S. 386 (1989), it misapplies that test. Given the facts of this case—and the presumption that a reviewing court must draw all reasonable inferences in favor of supporting the verdict—I think it clear that the jury could properly have found that this 5-foot-2-inch young lady posed no threat to the officers at the scene, and that they used excessive force in keeping her in handcuffs for up to three hours. Although *Summers* authorizes the detention of any individual

---

[3] While I agree with the Court's discussion of this issue, I note that the issue was not properly presented to the Ninth Circuit because it was not raised by either petitioners or respondent.

who is present when a valid search warrant is being executed, that case does not give officers *carte blanche* to keep individuals who pose no threat in handcuffs throughout a search, no matter how long it may last. On remand, I would therefore instruct the Court of Appeals to consider whether the evidence supports Mena's contention that the petitioners used excessive force in detaining her when it considers the length of the *Summers* detention.

## I

As the Court notes, the warrant in this case authorized the police to enter the Mena home to search for a gun belonging to Raymond Romero that may have been used in a gang-related driveby shooting. Romero, a known member of the West Side Locos gang, rented a room from the Mena family. The house, described as a " 'poor house,' " was home to several unrelated individuals who rented from the Menas. Brief for Petitioners 4. Each resident had his or her own bedroom, which could be locked with a padlock on the outside, and each had access to the living room and kitchen. In addition, several individuals lived in trailers in the back yard and also had access to the common spaces in the Mena home. *Id.,* at 5.

In addition to Romero, police had reason to believe that at least one other West Side Locos gang member had lived at the residence, although Romero's brother told police that the individual had returned to Mexico. The officers in charge of the search, petitioners Muehler and Brill, had been at the same residence a few months earlier on an unrelated domestic violence call, but did not see any other individuals they believed to be gang members inside the home on that occasion.

In light of the fact that the police believed that Romero possessed a gun and that there might be other gang members at the residence, petitioner Muehler decided to use a Special Weapons and Tactics (SWAT) team to execute the

warrant. As described in the majority opinion, eight members of the SWAT team forcefully entered the home at 7 a.m. In fact, Mena was the only occupant of the house, and she was asleep in her bedroom. The police woke her up at gunpoint, and immediately handcuffed her. At the same time, officers served another search warrant at the home of Romero's mother, where Romero was known to stay several nights each week. In part because Romero's mother had previously cooperated with police officers, they did not use a SWAT team to serve that warrant. Romero was found at his mother's house; after being cited for possession of a small amount of marijuana, he was released.

Meanwhile, after the SWAT team secured the Mena residence and gave the "all clear," police officers transferred Mena and three other individuals (who had been in trailers in the back yard) to a converted garage.[4] To get to the garage, Mena, who was still in her bedclothes, was forced to walk barefoot through the pouring rain. The officers kept her and the other three individuals in the garage for up to three hours while they searched the home. Although she requested them to remove the handcuffs, they refused to do so. For the duration of the search, two officers guarded Mena and the other three detainees. A .22-caliber handgun, ammunition, and gang-related paraphernalia were found in Romero's bedroom, and other gang-related paraphernalia was found in the living room. Officers found nothing of significance in Mena's bedroom.[5] *Id.*, at 6–9.

---

[4] The other individuals were a 55-year-old Latina female, a 40-year-old Latino male who was removed from the scene by the Immigration and Naturalization Service (INS), and a white male who appears to be in his early 30's and who was cited for possession of a small amount of marijuana.

[5] One of the justifications for our decision in *Michigan* v. *Summers*, 452 U. S. 692 (1981), was the fact that the occupants may be willing to "open locked doors or locked containers to avoid the use of force that is not only damaging to property but may also delay the completion of the task at hand." *Id.*, at 703. Mena, however, was never asked to assist the officers, although she testified that she was willing to do so. See 3 Tr. 42

## II

In analyzing the quantum of force used to effectuate the *Summers* detention, the Court rightly employs the "objective reasonableness" test of *Graham*. Under *Graham*, the trier of fact must balance "'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." 490 U. S., at 396. The District Court correctly instructed the jury to take into consideration such factors as "'the severity of the suspected crime, whether the person being detained is the subject of the investigation, whether such person poses an immediate threat to the security of the police or others or to the ability of the police to conduct the search, and whether such person is actively resisting arrest or attempting to flee.'" See n. 2, *supra*. The District Court also correctly instructed the jury to consider whether the detention was prolonged and whether Mena was detained in handcuffs after the search had ended. *Ibid.* Many of these factors are taken from *Graham* itself, and the jury instruction reflects an entirely reasonable construction of the objective reasonableness test in the *Summers* context.

Considering those factors, it is clear that the SWAT team's initial actions were reasonable. When officers undertake a dangerous assignment to execute a warrant to search property that is presumably occupied by violence-prone gang members, it may well be appropriate to use both overwhelming force and surprise in order to secure the premises as promptly as possible. In this case the decision to use a SWAT team of eight heavily armed officers and to execute the warrant at 7 a.m. gave the officers maximum protection against the anticipated risk. As it turned out, there was only one person in the house—Mena—and she was sound asleep. Nevertheless, "[t]he 'reasonableness' of a particular

(June 14, 2001). Instead, officers broke the locks on several cabinets and dressers to which Mena possessed the keys.

use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham,* 490 U. S., at 396. At the time they first encountered Mena, the officers had no way of knowing her relation to Romero, whether she was affiliated with the West Side Locos, or whether she had any weapons on her person. Further, the officers needed to use overwhelming force to immediately take command of the situation; by handcuffing Mena they could more quickly secure her room and join the other officers. It would be unreasonable to expect officers, who are entering what they believe to be a high risk situation, to spend the time necessary to determine whether Mena was a threat before they handcuffed her. To the extent that the Court of Appeals relied on the initial actions of the SWAT team to find that there was sufficient evidence to support the jury's verdict, it was in error.

Whether the well-founded fears that justified the extraordinary entry into the house should also justify a prolonged interruption of the morning routine of a presumptively innocent person, however, is a separate question and one that depends on the specific facts of the case. This is true with respect both to how the handcuffs were used, and to the totality of the circumstances surrounding the detention, including whether Mena was detained in handcuffs after the search had concluded. With regard to the handcuffs, police may use them in different ways.[6] Here, the cuffs kept Mena's arms behind her for two to three hours. She testified that they were " 'real uncomfortable' " and that she had asked the officers to remove them, but that they had refused. App. 105. Moreover, she was continuously guarded by two

---

[6] For instance, a suspect may be handcuffed to a fixed object, to a custodian, or her hands may simply be linked to one another. The cuffs may join the wrists either in the front or the back of the torso. They can be so tight that they are painful, particularly when applied for prolonged periods. While they restrict movement, they do not necessarily preclude flight if the prisoner is not kept under constant surveillance.

police officers who obviously made flight virtually impossible even if the cuffs had been removed.

A jury could reasonably have found a number of facts supporting a conclusion that the prolonged handcuffing was unreasonable. No contraband was found in Mena's room or on her person. There were no indications suggesting she was or ever had been a gang member, which was consistent with the fact that during the police officers' last visit to the home, no gang members were present. She fully cooperated with the officers and the INS agent, answering all their questions. She was unarmed, and given her small size, was clearly no match for either of the two armed officers who were guarding her. In sum, there was no evidence that Mena posed any threat to the officers or anyone else.

The justifications offered by the officers are not persuasive. They have argued that at least six armed officers were required to guard the four detainees, even though all of them had been searched for weapons. Since there were 18 officers at the scene, and since at least 1 officer who at one point guarded Mena and the other three residents was sent home after offering to assist in the search, it seems unlikely that lack of resources was really a problem. While a court should not ordinarily question the allocation of police officers or resources, a jury could have reasonably found that this is a case where ample resources were available.

The jury may also have been skeptical of testimony that the officers in fact feared for their safety given that the actual suspect of the shooting had been found at the other location and promptly released. Additionally, while the officers testified that as a general matter they would not release an individual from handcuffs while searching a residence, the SWAT team's tactical plan for this particular search arguably called for them to do just that, since it directed that "[a]ny subjects encountered will be handcuffed and detained until they can be patted down, their location noted, [field identi-

fied], and released by Officer Muehler or Officer R. Brill." 2 Record 53. The tactical plan suggests that they can, and often do, release individuals who are not related to the search. The SWAT team leader testified that handcuffs are not always required when executing a search.

In short, under the factors listed in *Graham* and those validly presented to the jury in the jury instructions, a jury could have reasonably found from the evidence that there was no apparent need to handcuff Mena for the entire duration of the search and that she was detained for an unreasonably prolonged period. She posed no threat whatsoever to the officers at the scene. She was not suspected of any crime and was not a person targeted by the search warrant. She had no reason to flee the scene and gave no indication that she desired to do so. Viewing the facts in the light most favorable to the jury's verdict, as we are required to do, there is certainly no obvious factual basis for rejecting the jury's verdict that the officers acted unreasonably, and no obvious basis for rejecting the conclusion that, on these facts, the quantum of force used was unreasonable as a matter of law.

### III

Police officers' legitimate concern for their own safety is always a factor that should weigh heavily in balancing the relevant *Graham* factors. But, as Officer Brill admitted at trial, if that justification were always sufficient, it would authorize the handcuffing of every occupant of the premises for the duration of every *Summers* detention. Nothing in either the *Summers* or the *Graham* opinion provides any support for such a result. Rather, the decision of what force to use must be made on a case-by-case basis. There is evidence in this record that may well support the conclusion that it was unreasonable to handcuff Mena throughout the search. On remand, therefore, I would instruct the Ninth Circuit to consider that evidence, as well as the possibility

that Mena was detained after the search was completed, when deciding whether the evidence in the record is sufficient to support the jury's verdict.