BETTY B. FLETCHER, Circuit Judge,
specially concurring:
Although I concur in the result reached in the majority opinion and in sections H.A., II.B. and II.D., the opinion’s analysis of claims against King County, I cannot concur in section II.C. dealing with the liability of the City of Seattle. I disagree with the majority’s reasoning in that section of the opinion and offer an alternate, taking as true the Plaintiffs’ (non-moving parties’) assertion of the facts, as the basis for deciding these claims. The police officers’ search of boarders’ rooms was not reasonable within the meanings of Gan-wich and Muehler. However, since the suit is against the City, not the individual officers, Monell v. Department of Social Senices, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), controls. Plaintiffs have not shown that the Seattle Police Department’s policies or training caused the alleged deprivation of their civil rights.
In the majority opinion, the preamble to Section II accurately reflects the issues that we must decide in this appeal. As to the City of Seattle, the issue is “whether the City of Seattle is liable as a municipality for having a policy or custom that caused Plaintiffs to be detained unreasonably by the City of Seattle’s police during the search of Plaintiffs’ residences, in violation of the Fourth and Fourteenth Amendments.” Majority at 1061 (emphasis added). We need not determine, as the majority opinion does, whether or not the conduct of the police officers in their detention of the Plaintiffs was constitutional in all its aspects. Because the posture of the appeal requires us to accept as true all of Plaintiffs’ assertions, there are material issues of fact that make such a conclusion impermissible.
I. Monell Entitles the City of Seattle to Summary Judgment
Despite serious concerns about the conduct of the police, this case cannot survive *1072 summary judgment. Plaintiffs did not name in their cause of action the individual police officers who searched their rooms and violated their rights. Rather, Plaintiffs pleaded a case of municipal liability, claiming that the City of Seattle and its police chief were liable for their policies concerning detentions incident to search warrants and for their failure to properly train police officers to conduct those detentions.' And so, Plaintiffs’ claims are controlled by Monell, 436 U.S. at 691-692, 98 S.Ct. 2018. To survive summary judgment, there must be a genuine dispute of material fact as to whether there was a(l) policy or practice that (2) caused (3) a violation of plaintiffs’ rights; Id. at 692, 98 S.Ct. 2018.
Although, Plaintiffs have demonstrated at least a dispute of fact as to whethér there were violations of plaintiffs’ rights during the execution of the search warrant, they have failed to show that a policy of the City of Seattle or Seattle Police Department caused these violations. Roman Welyczko, an attorney with. DPH, testified in’ his deposition that while DPH does not have a formal, written policy that police accompany inspectors on every inspection warrant, “the expectation of the department and what I have consistently communicated to staff is to have police accompaniment for reasons of safety and security.” ER 204. In his deposition, Seattle Police Captain Kessler indicated that “generally, yes, we would detain people when we’re in the middle of a search warrant of any kind. That’s a basic officer’s safety premise.” ER 252. There is evidence, therefore, that both DPH and SPD have policies or custorns concerning police accompaniment of DPH inspectors and detention incident to a search warrant for safety reasons.
Plaintiffs argue, however, that DPH and SPD failed to train their employees in how to execute the departments’ respective policies,, but the record does not support this contention. The relevant issue here is not the training of DPH inspectors, but rather the training of police officers, who are responsible for the seizure and detention of the residents incident to implementation of a search warrant. According to Captain Kessler, SPD training as to detentions varies from situation to situation; officers have been trained to handle such detentions; and training is ongoing to assure that the detentions are executed in a constitutional manner. Plaintiffs do not refute this evidence of training and fail to create a genuine dispute of material fact as to whether the policies of the Seattle Police Department caused the violation of Plaintiffs’ rights. Summary judgment in favor of defendants is, therefore, appropriate under Monell.
II. The Police Officers’ Searches
Because this case presents an appeal from cross motions for summary judgment in‘which the district court granted summary judgment in favor of defendants, our review must be de novo and we' must view the evidence in the light most favorable to plaintiffs to the extent that there is factual dispute. Am. Bankers Assoc, v. Gould, 412 F.3d 1081, 1085-86 (9th Cir.2005). The majority cites this standard, Majority at 1056-57, n. 1, 1067 but fails to apply it.
The majority considers only whether the police had the authority to detain the residents and whether that detention was reasonably conducted, stopping short of considering the actual searches. It concluded that “[a]part from the decision to detain and the manner of detention, other police conduct that might raise a constitutional question in an appropriate case is not before us.” Majority at 1067, n. 8. Somehow the majority erroneously thinks that the fact that this case. does not concern a motion to suppress evidence found during *1073 the searches bars us from considering whether the searches violated Plaintiffs’ rights.
A. Searching Beyond the Warrant
The majority relies on Muehler v. Mena, Michigan v. Summers, and Ganwich v. Knapp[1] to describe the limits within which police have authority to detain incidental to executing a search warrant. Muehler held that the police “authority to detain incident to a search is categorical; it does not depend on the quantum of proof justifying detention or the extent of the intrusion to be imposed by the seizure.” Mueh-ler v. Mena, 544 U.S. 93, 125 S.Ct. 1465, 1470, 161 L.Ed.2d 299 (2005) (internal quotation marks omitted). The majority derives from this trio of cases its position that “the duration of a detention may be coextensive with the period of a search, and require no further justification” as long as that detention is conducted in a reasonable manner. Majority at 1066.
All that may be true, but a “reasonable detention” does not allow search for items beyond those authorized by the warrant. Nor does it allow for detention beyond that necessary to conduct the authorized search (for evidence of health code violations, in this instance).[2]
Muehler and Ganwich permit a detention incident to the execution of a search warrant, to protect the officers and inspectors executing that warrant. These cases do not support a search for items outside the scope of the warrant — in essence, a search incident to the detention. It was “reasonable” for the police to detain the residents in a single room while the DPH inspectors executed their search warrant. It was “reasonable” to frisk the residents at the outset of that detention. It was not “reasonable” to question boarders as to whether there were drugs or weapons in their rooms or to search their rooms for drugs or weapons as part of this detention. Such searches are insupportable under Muehler and Ganwich. The majority argues that questioning about drugs is “reasonable” because knowing whether the detained residents are drug users will alert *1074 the police to their potential for violent behavior; the majority reasons that knowing whether there are weapons present in boarders’ rooms is “reasonable” to protect police officers and DPH inspectors. Majority at 1068. The majority’s opinion allows not just the “reasonable” detention of the residents incident to the execution of the inspection warrant, as permitted by Ganwich and Muehler, but also the war-rantless search for drugs and weapons, drugs and weapons from which the residents were physically isolated by virtue of their detention. The officer, inspector, and resident safety justifications cannot be supported on this basis. Permission for the search incident to detention here expands Ganwich and Muehler, unjustifiably, and runs roughshod over the Fourth and Fourteenth Amendments in the process. I cannot support it.
Contrary to the majority’s view of the evidence, that the police simply accompanied DPH personnel during their search to provide continued security, taking the evidence in the light most favorable to Plaintiffs indicates that the police were themselves involved in searching for things outside the scope of the warrant.
As the majority opinion indicates, Plaintiff Shelly Sogga testified by declaration that about an hour and a half into the inspection of 6418, a police officer escorted her from the detention room. She was taken to the basement bathroom where that officer told her that he had found drug paraphernalia in her room. Sogga was placed under arrest and read her rights. The police continued to question Sogga about the contents of her room, and in so doing, referred to a letter from her mother, which Sogga believed the police had read. The police told her to sign a consent form. When she asked to speak to a lawyer, the police told her that she “could talk to one from jail” and said that, if she refused to give her consent, she would go to jail. Sogga’s Affidavit. She signed the consent form. When she was allowed to return to her room twenty minutes later, she found that the police had searched her entire room, rifling through personal papers and leaving intimate photos in full view.
The majori ty distinguishes this case from Ganwich v. Knapp. Not so! Sog-ga’s story evokes the very issues upon which Judge Gould rested his opinion in Ganwich v. Knapp, where the police detained employees in a waiting room and did not release them until they consented to interrogation. 319 F.3d 1115, 1120-1121 (9th Cir.2003). While the majority may argue that finding the drug paraphernalia gave the police probable cause to question Sogga, it is not clear how the police came upon this drug paraphernalia. The majority cites Officers Jamieson’s and Zylack’s police report which states that “[djuring the search of the premises, several items of narcotics paraphernalia were observed in plain view by officers in a room that is occupied by S/Sogga.” SPD Incident Report, Sept. 30, 1999. Sogga testified that the magic mushrooms were in a silver container on the table. Sogga Deposition at 84, June 9, 2003. The standard of review, requiring us to take the facts in the light most favorable to plaintiffs, is determinative here. We must credit Sogga’s version of the facts, in which the police had read through a personal letter from her mother, indicating that they were searching, not simply clearing the rooms of people to make them safe, and in which the magic mushrooms were in a container. Viewing the facts in the light most favorable to plaintiffs, the police were engaged in searching beyond the scope of the warrant; at the least, there is a genuine question of fact on this issue.
Plaintiff Jerri Dawson, a resident of 6420, testified by declaration that the po *1075 lice knocked on her door and told her to proceed to the back yard. She was not given time to put on her shoes. Once she reached the back yard, a police officer asked for her identification, which she had left in her room; the officer escorted her back to her room to retrieve her identification. When she entered her room, she found two SPD officers “apparently searching it.” Dawson Affidavit. One “appeared to be looking into [her] closet and the other was standing next to the table that contained [her] personal papers, jewelry making materials, and medication.” Again, the police did not permit Dawson to put on shoes, despite the presence of broken glass near the patio where she would be detained. When the inspection of 6420 ended and Dawson was permitted to leave the back yard, she returned to her room to find that all of her personal papers had been rearranged, as had her medications.
Once the police had determined that no one was left in the rooms, they had finished the search necessary to effectuate the detention of residents that would protect DPH inspectors, SPD officers, and the residents. At that point, the warrant gave DPH Inspectors authority to search for the items specified in the warrant. Continued SPD searches of individual boarders’ rooms for other than the items listed in the warrant was a violation of their constitutional rights. The majority’s justification for searches for weapons and drugs is not supportable under Muehler or Ganwich.
B. The Detention was Not “Coextensive” With the Execution of the Search Warrant
Furthermore, Plaintiffs’ version of the facts, which we must credit, does not support the majority’s conclusion that “the police released Plaintiffs as soon as DPH finished inspecting the boardinghouses.” Majority at 1069. Plaintiffs argue that the detention of the residents of 6418 was not “coextensive” with the DPH inspectors’ execution of their warrant. DPH Inspector Lasby testified that the detention of residents continued, and police continued to search the premises, after the DPH inspectors had completed execution of their inspection warrant. Lasby testified that he went with “the entire staff’ to get a cup of coffee in between the inspections of 6418 and that of 6420; they were gone for twenty to thirty minutes. Upon returning, they had to wait for the police to “finish 6418.” Lasby Deposition at 98, June 2, 2003. Mr. Lasby believed that the police had “gotten their own search warrant and were completing work on that.” Id. at 99. In fact the police had no such warrant.
Plaintiff Sogga’s statements indicate that the extension of the detention was due to the police search of her room. The majority may argue that this extension was permissible, although outside the scope of Muehler, because the police had probable cause for their search of Sogga’s room for drug paraphernalia, but any such determination is based on disputed facts. What is clear is that the police officers’ continued search (1) was for items not covered by DPH’s search warrant and (2) extended the detention of 6418’s residents such that it was no longer coextensive with the execution of the warrant. See Mueh-ler v. Mena, 544 U.S. 93, 125 S.Ct. 1465, 1470, 161 L.Ed.2d 299 (2005) (“Mena’s detention for the duration of the search was reasonable under Summers because a warrant existed to search 1363 Patricia Avenue and she was an occupant of that address at the time of the search.”). In contrast to Muehler, where the warrant authorized a broad search of the house for weapons and evidence of gang membership, id. at 1468, the warrant before us was specific, limiting the search to health hazards such as rat droppings.
*1076 Police searches incident to detention and the inconsistency between the duration of the detention and the length of the authorized inspection brings the issue of conduct of those police officers before us and brings into question the majority’s justification for ending their analysis with a justification for the detention and its reasonableness. See Ganwieh, 319 F.3d at 1121, n. 9 (“The detention of building occupants during the execution of a search warrant may become unreasonable if it lasts too long. We cannot tell whether the detention during the execution of the warrant was too long in this instance, as the officers did not limit their activities to executing the warrant.”). The majority’s inquiry should have encompassed what happened once the residents of these two boarding houses were safely detained, the extent to which there was questioning about and searching for things outside the scope of the warrant and their detention after the authorized search was completed. The majority’s decision not to address these questions implicitly condones police behavior which is deeply troubling.
III. Conclusion
Crediting Plaintiffs’ version of the facts, as we must, Seattle police officers searched the rooms of the residents of 6418 and 6420 for items outside the scope of the warrant. This search went beyond what is reasonable under Ganwieh and Muehler. The search and detention exceeded what was necessary to guarantee the security and safety of the DPH inspectors, the police officers, and the residents, and beyond what the warrant under which they had authority to search permitted. Once boarders had been frisked and detained in a single room, the house was secure. There was no need for the police to undertake further searches. However, because Monell controls here, I reach the same result as the majority, that we should affirm the district court’s grant of summary judgment to defendants, but we should not condone the alleged misconduct of Seattle police officers.

. 544 U.S. 93, 125 S.Ct. 1465, 161 L.Ed.2d 299 (2005); 452 U.S. 692, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981); 319 F.3d 1115 (9th Cir. 2003).

. The warrant obtained by DPH inspectors to search 6418 Brooklyn Ave NE reads as follows:
The Seattle-King County Department of Public Health has applied for a Health Code Inspection Warrant to conduct a health code inspection of the premises at 6418 Brooklyn Ave NE, Seattle, Washington 98115, including the shack in the rear yard, other outbuildings on the premises and any and all housing units that may be contained therein....
NOW, THEREFORE, you are hereby commanded to enter the premises at 6418 Brooklyn Ave NE, Seattle, Washington to inspect the exterior, including but not limited to, common areas, yards, crawlspaces, porches, basement, attic and any out buildings, appliances, on the premises, specifically including the shack in the rear yard of the property that serves as a living unit. IT IS FURTHER ORDERED that you search inside the premises, including the shack in the rear yard, in areas where violations may exist including but not limited to, any individual dwelling units or apartments or rooms or other housing units that may exist inside the main building, and in the main building and in the shack, in cabinets, closets, under furniture, inside furniture, inside appliances, in common areas, storage spaces, basements and attics.
IT IS FURTHER ORDERED that you search for evidence of violations of the Seattle Municipal Health Code and seize any evidence of such violations, including photographs and any other evidence of filth, debris, rodent or insect infestation.... The purpose of the inspection is to discover violations of the Seattle Municipal Health Code.... You may obtain whatever assistance is necessary and proper under the circumstances.