[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 13-13834
Non-Argument Calendar
_____

D.C. Docket No. 2:12-cr-00001-LGW-JEG-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

RODERICK BURROWS,

Defendant-Appellant.
_____

Appeal from the United States District Court
for the Southern District of Georgia
_____

(May 1, 2014)

Before HULL, MARCUS and JORDAN, Circuit Judges.

PER CURIAM:

Defendant-appellant Roderick Burrows appeals the district court's denial of

his pre-trial suppression motion.  Burrows sought to suppress, inter alia, evidence

obtained from a warrantless search of his vehicle following a traffic stop, and from a search, pursuant to a warrant, of a laptop computer found inside the vehicle. After the district court denied Burrows's suppression motion, Burrows pled guilty to possession of unauthorized access devices in violation of 18 U.S.C. § 1029(a)(3) and received a sentence of 20 months' imprisonment. Having carefully reviewed the briefs and the record, including the videotape of the traffic stop, we affirm the district court's denial of the suppression motion.

## I.  FACTS AND PROCEDURAL HISTORY

We describe in detail the traffic stop, drawing from the videotape and testimony introduced during the suppression hearing.

**A.    November 21, 2011 Traffic Stop**

At around 8:00 AM on November 21, 2011, on Interstate 95, Deputy William Woolard of the Camden County, Georgia Sheriff's Office stopped a minivan driven by defendant Burrows. Deputy Woolard stopped Burrows's vehicle because Burrows was "weaving in and out of the lanes" without signaling.

After stopping defendant Burrows, Deputy Woolard approached the minivan and requested Burrows's license. Burrows produced a North Carolina driver's license and informed Deputy Woolard that the minivan was rented. Burrows, however, was unable to produce a rental agreement, explaining that his girlfriend had rented the minivan and had probably kept the rental agreement with her.

2

Deputy Woolard instructed Burrows to exit the minivan and to stand in front of the police car. Burrows did so. Deputy Woolard observed that Burrows was unusually nervous and thus asked Burrows additional questions, including: (1) where he was going and coming from; (2) how long he had been driving; (3) where he had spent the night; and (4) how long he intended to be away from home.

Burrows responded that he: (1) was going to St. Augustine to play poker and was coming from Atlanta; (2) had only been on the road for about an hour; (3) had spent the night at a Hilton hotel in a town up the road whose name Burrows could not recall; and (4) was not sure how long he planned to stay on the road.

Based on Burrows's nervous demeanor, his unusual travel plans, and his inability to recall simple details about his activities, Deputy Woolard "thought maybe there was other criminal activity going on." Nevertheless, Deputy Woolard decided to give Burrows only a warning citation. Deputy Woolard returned to his police car to retrieve his warning citation book.

Around this time, Sergeant Cedric Brown arrived on the scene in a separate police car. In Sergeant Brown's vehicle was a dog trained in drug odor detection (the "drug dog"). Sergeant Brown and his dog initially remained in his vehicle upon arrival.

After retrieving his warning citation book, Deputy Woolard returned to where Burrows was standing and started to write the citation. Burrows's demeanor

3

indicated that he was still "extremely nervous." Deputy Woolard considered this strange because, in his experience, most people relax upon learning that they will receive only a warning citation. Thus, while completing the citation form, Deputy Woolard continued to ask Burrows questions "about his travel plans, where he was, this, that, and the other."

Specifically, Deputy Woolard asked Burrows: (1) where he planned to stay in St. Augustine; (2) where he had stayed in Atlanta; (3) what he had done while in Atlanta; (4) and how he had wound up in Atlanta when traveling from Charlotte to St. Augustine. Regarding his trip to Atlanta, Burrow responded that he had: (1) stayed with a friend, whose last name he did not know; (2) gone to only a shopping mall during the two days he had spent there; and (3) gotten on Interstate 85, thinking that road would take him to Interstate 95, and accidentally found himself in Atlanta.

While still completing the warning citation form, Deputy Woolard asked Burrows if he had anything illegal in his minivan, specifically "any drugs of any kind" or "large amounts of cash." Burrows answered that he did not. Deputy Woolard then requested Burrows's consent to search the minivan, and Burrows

4

declined.  At this point, Deputy Woolard still had not finished filling out the warning citation and had the incomplete citation in his hand.[1]

After Burrows refused to allow Deputy Woolard to search the minivan, Deputy Woolard signaled with his hand to Sergeant Brown to "run his canine around the vehicle."  Deputy Woolard gave this signal approximately ten minutes after first observing Burrows commit a traffic violation.

## B.    Search of Burrows's Minivan

Sergeant Brown conduct a "dog sniff" of the minivan by walking the leashed drug dog around Burrows's vehicle.  As Sergeant Brown was doing so, Deputy Woolard continued to fill out the warning citation form.

Shortly thereafter, less than 12 minutes into the traffic stop, the drug dog began barking, which Deputy Woolard and Sergeant Brown testified was an alert for the presence of narcotics.  Based on the alert, Deputy Woolard and Sergeant Brown began searching the interior of the minivan.  Inside the vehicle, the officers found 19 fraudulent driver's licenses and 6 credit cards associated with the fraudulent licenses.  Each license bore Burrows's picture, but had a different name. The credit cards bore the same names as the licenses.  The officers also found a

---

[1]During the suppression hearing, Deputy Woolard initially testified that the request for consent to search the minivan came after he completed the warning citation form.  Deputy Woolard later clarified that he "never gave [Burrows] the warning citation" and stated, "[w]hile I was filling out . . . the warning citation is when I asked him for consent."  The videotape of the traffic stop confirms Deputy Woolard's clarification.

5

laptop computer and a credit card reader-writer.[2]  After finding these items, the officers handcuffed Burrows, continued to search the minivan, advised Burrows of his <u>Miranda</u> rights, and later transported him to the jail.[3]

Later on, Burrows's minivan was inventoried and released to a towing company.  The towing company found 13 more credit cards and 2 more driver's licenses, all having various names on them.  At no point were narcotics ever found in the vehicle.  Deputy Woolard explained that this was not unusual because the drug dog was trained to detect the presence of "residual odor."

C.     **Search of Burrows's Laptop Computer**

Also on November 21, a detective from the Sheriff's office contacted Special Agent Will Griffin of the U.S. Secret Service.  The detective requested Agent Griffin's assistance in examining the items obtained from Burrows's minivan.  The next day, using a device in his office, Agent Griffin determined that 22 of the 30 credit cards seized from Burrows's minivan had been reprogrammed.

---

[2]During the suppression hearing, a Secret Service agent testified that a credit card reader-writer is a device, common in retail stores, through which a customer scans his or her credit card.  The device reads the cardholder's name, account number, and other information, and uses that information to charge the person's account.  Unlike devices in retail stores, however, the device Burrows possessed also allows for the reprogramming of credit cards with account information purchased from the Internet.

[3]The district court granted Burrows's suppression motion regarding statements Burrows made between being handcuffed and being advised of his <u>Miranda</u> rights.   The government does not appeal this ruling.

Based on this information, 17 days later, on December 1, Agent Griffin applied for a search warrant to conduct a forensic examination of the seized laptop computer. Agent Griffin sought to learn whether Burrows had used the computer to purchase from the Internet credit card information that could be reprogrammed on to a fraudulent credit card. A magistrate judge issued the warrant one week later, on December 8.

Around December 14, a Savannah, Georgia police officer working with the Secret Service conducted a search of Burrows's laptop computer. The officer determined that the computer contained credit card files downloaded from the Internet.

## D.     Indictment

On March 8, 2012, a federal grand jury indicted Burrows on five offenses, all relating to his possession of the fraudulent driver's licenses and credit cards, as well as the electronic equipment used to make those items.[4] Burrows pleaded not guilty to all charges.

## E.     Suppression Motion

Burrows filed a motion to suppress, inter alia: (1) the items seized from his minivan; and (2) the information obtained from the forensic search of his laptop

---

[4]Specifically, the grand jury charged Burrows with: (1) possession of false identification documents in violation of 18 U.S.C. § 1028(a)(3); (2) possession of counterfeit access devices in violation of 18 U.S.C. § 1029(a)(3); possession of unauthorized access devices also in violation of 18 U.S.C. § 1029(a)(3); (4) possession of access device-making equipment in violation of 18 U.S.C. § 1029(a)(4); and aggravated identify theft in violation of 18 U.S.C. § 1028A(a)(1).

computer.  A magistrate judge held a hearing on the suppression motion, and issued a report and recommendation.  The magistrate judge's report recommended denying the motion to suppress the items seized from the minivan and the information from the laptop computer.

Burrows objected to the magistrate judge's report and the district court issued an order denying Burrows's motion to suppress the items seized from the vehicle and the information from the laptop computer.

## F.    Plea Agreement, Sentencing, and Appeal

Afterwards, Burrows entered into a written plea agreement with the government.  Burrows agreed to plead guilty to the count for possession of unauthorized access devices, and the government agreed to dismiss the other four counts.  The plea agreement stated that Burrows "reserves the right to contest on appeal the lawfulness of the search of his vehicle on or about November 21, 2011." After accepting Burrows's plea, the district court imposed a sentence of 20 months' imprisonment.

Burrows timely appealed the district court's order denying his suppression motion.[5]

## II. DISCUSSION

---

[5]A denial of a suppression motion raises a mixed question of law and fact.  United States v. Frank, 599 F.3d 1221, 1228 (11th Cir. 2010).  We review factual findings for clear error and review de novo the district court's application of those facts to legal standards.  Id.  In doing so, we construe all facts in the light most favorable to the prevailing party below.  United States v. Bervaldi, 226 F.3d 1256, 1262 (11th Cir. 2000).

8

**A.    The Lawfulness of Burrows's Detention at the Time of the Dog Sniff**

The Fourth Amendment protects individuals from unreasonable searches and seizures.  U.S. Const. amend. IV.  The Supreme Court has made clear that a dog sniff is not a search subject to Fourth Amendment protection.  Muehler v. Mena, 544 U.S. 93, 101, 125 S. Ct. 1465, 1471 (2005).  Therefore, "[a] dog sniff conducted during a . . . lawful traffic stop that reveals no information other than the location of a substance that no individual has any right to possess does not violate the Fourth Amendment."  Illinois v. Caballes, 543 U.S. 405, 410, 125 S. Ct. 834, 838 (2005) (emphasis added).  However, an officer may not conduct a dog sniff if the traffic stop becomes an unlawful detention.  See id. at 407–08, 125 S. Ct. at 837.  Thus the question here is whether Burrows's traffic stop had become an unlawful detention at the time of the dog sniff.

We evaluate traffic stops under Terry v. Ohio, 392 U.S. 1, 88 S. Ct. 1868 (1968), asking: (1) whether the officer's actions during the traffic stop were "reasonably related in scope" to the officer's initial basis for stopping the motorist; and (2) whether "the duration of the traffic stop" was "limited to the time necessary to effectuate the purpose of the stop."  United States v. Purcell, 236 F.3d 1274, 1277 (11th Cir. 2001) (quotation marks omitted).

The Supreme Court recently held that "[a]n officer's inquiries into matters unrelated to the justification for the traffic stop . . . do not convert the encounter

9

into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop." Arizona v. Johnson, 555 U.S. 323, 333, 129 S. Ct. 781, 788 (2009); see also United States v. Griffin, 696 F.3d 1354, 1362 (11th Cir. 2012) ("[U]nrelated questions posed during a valid Terry stop do not create a Fourth Amendment problem unless they 'measurably extend the duration of the stop.'").

Here, Burrows has not shown a Fourth Amendment violation. First, only 12 minutes passed between the beginning of the traffic stop and the drug dog's alert. See United States v. Hernandez, 418 F.3d 1206, 1212 n.7 (11th Cir. 2005) (expressing "doubt that a [traffic stop] seizure of no more than seventeen minutes can ever be unconstitutional on account of its duration: the detention is too short").

Second, Deputy Woolard started completing the warning citation form shortly after the stop commenced and continued to complete the form as he questioned Burrows about both the traffic offense and other matters. We have previously held that when an unrelated question "was asked while the officer was still writing out the citation . . . the unrelated question did nothing to extend the duration of the initial, valid seizure." Purcell, 236 F.3d at 1280; cf. United States v. Boyce, 351 F.3d 1102, 1107 (11th Cir. 2003) (officer violated Fourth Amendment by detaining motorist after finishing writing the warning citation and returning the driver's license and car rental agreement). The same is true here.

10

Deputy Woolard's unrelated questions did not take very long to ask or to answer, and Deputy Woolard completed the warning citation form as he asked these questions.

Third, given all of the circumstances in the record and the limited 12-minute duration of the stop before the dog's alert, the district court found that Deputy Woolard's asking questions about matters outside the scope of Burrows's traffic violation did not unreasonably prolong the traffic stop, and that finding was not clearly erroneous.

Burrows relies on United States v. Pruitt, 174 F.3d 1215 (11th Cir. 1999), but that case does not help him. In Pruitt, the officer: (1) stopped the defendants' vehicle for speeding; (2) instead of completing a speeding ticket form, asked the defendants numerous questions unrelated to the speeding offense; (3) requested the driver-defendant's consent to search the vehicle; and (4) when the defendant refused, then waited for an extended period on a dog unit to arrive. Id. at 1217–18. The stop lasted approximately thirty minutes before the dog alerted. Id. at 1218.[6] If anything, Pruitt shows how different this stop was in both duration (12 minutes)

---

[6]It is also unclear whether Pruitt remains authoritative in the wake of the Supreme Court's decision in Johnson. In Pruitt, this Court held that the officer's "questioning following the stop . . . should have been directed to securing [the driver's] license, registration and insurance papers." 174 F.3d at 1221. However, as discussed, Johnson makes clear that the Fourth Amendment does not limit the questions an officer conducting a traffic stop may ask absent a lengthening of the stop. 555 U.S. at 333, 129 S. Ct. at 788. Nevertheless, because Pruitt is factually distinguishable, we need not decide the legal question of whether Pruitt has been overruled.

and scope (as Deputy Woolard asked the questions primarily while he wrote out the warning citation).[7]

## B.    Adequacy of the Dog's Training

Next, Burrows argues that the officers lacked probable cause to search the minivan because Sergeant Brown's dog was not adequately trained in the detection of narcotics.  Burrows's argument fails because the district court's finding—that the drug dog was "thoroughly and adequately trained"—was supported by evidence and not clearly erroneous.

The alert of a drug dog can give rise to probable cause to search.  See United States v. Smith, 459 F.3d 1276, 1291 (11th Cir. 2006) (collecting cases).  The Supreme Court recently explained the requirements for a drug dog's alert to confer probable cause, stating that "evidence of a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his alert."  Florida v. Harris, 568 U.S. __, __, 133 S. Ct. 1050, 1057 (2013).  Therefore, when "a bona fide organization has certified a dog after testing his reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search."  Id.  A

---

[7]We recognize that Deputy Woolard would have been entitled to further detain Burrows if Burrows's actions during the traffic stop gave rise to reasonable suspicion of additional criminal activity.  However, in light of our conclusion that Deputy Woolard did not impermissibly extend the duration of the traffic stop, we need not decide whether Burrows's actions gave rise to reasonable suspicion here.

court may also make this presumption "even in the absence of formal certification, if the dog has recently and successfully completed a training program that evaluated his proficiency in locating drugs." Id.; see United States v. Sentovich, 677 F.2d 834, 838 n.8 (11th Cir. 1982) (stating "training of a dog alone is sufficient proof of reliability").

Here, at the suppression hearing, the government offered extensive evidence of the drug dog's training. Sergeant Brown testified that, in June 2011, five months before the traffic stop, both he and the dog successfully passed a certification course offered by the North American Police Work Dog Association. The dog received training in detecting the odors of cocaine and marijuana. Additionally, between June 2011 and the November 2011 traffic stop, twice each month, Sergeant Brown and his colleagues trained the dog by allowing him to smell a quantity of drugs, hiding those drugs, and sending the dog out to find the drugs.

Burrows takes issue with the fact that the government could not produce logs of the dog's training. However, in Harris, the Supreme Court expressly rejected the use of any "strict evidentiary checklist" for determining the adequacy of a drug dog's training. See Harris, 568 U.S. at __, 133 S. Ct. at 1056.

Burrows also contends that the drug dog's alert did not establish probable cause because the dog was trained in detecting residual odors of drugs no longer

13

present in a vehicle. Burrows's argument is that because the drug dog was trained in residual odor detection, and because the minivan was a rental, the dog's alert was "not probative" as it was "likely" that the dog "alerted to drug odors in the car caused by someone else's drug use."

In Harris, the Supreme Court addressed a "residual odor" argument similar to Burrows's. It stated that "[i]n the usual case, the mere chance that the substance might no longer be at the location does not matter; a well-trained dog's alert establishes a fair probability—all that is required for probable cause—that either drugs or evidence of a drug crime . . . will be found." 568 U.S. at __ n.2, 133 S. Ct. at 1056 n.2. The fact that Burrows did not own the car he was driving did not make the case unusual.[8]

## C.    The Search of the Laptop Computer on December 15, 2011

Even if Burrows's traffic stop and the November 21 search of the vehicle were legal, Burrows makes a separate and different Fourth Amendment claim about the December 15 search of the laptop computer. Burrows contends that the 17-day delay between the seizure of his laptop computer and the government's obtaining a warrant to search the computer was unreasonable in violation of the

---

[8]To the extent that Burrows challenges whether the drug dog alerted at all, we reject that argument. Both Deputy Woolard and Sergeant Brown testified that the dog alerted. Based on this testimony, the district court found that the drug dog did alert to the presence of narcotics. The district court's fact finding was not clearly erroneous.

14

Fourth Amendment.  Burrows, however, did not preserve in his plea agreement the right to raise this claim on appeal.

Burrows pled guilty, thus waiving all nonjurisdictional challenges to his conviction.  See Wilson v. United States, 962 F.2d 996, 997 (11th Cir. 1992).  In his plea agreement, Burrows did not preserve the right to contest the lawfulness of the search of his laptop computer on December 15.  Rather, his plea agreement preserved only the right to "contest on appeal the lawfulness of the search of his vehicle on or about November 21, 2011."  The plea agreement further stated that "[s]hould defendant prevail on appeal, he shall be allowed to withdraw his plea of guilty."  The fact that, before the district court, Burrows used one motion to challenge both the November 21 and December 15 searches does not change the result here.

Burrows entered his conditional guilty plea pursuant to Rule 11(a)(2) of the Federal Rules of Criminal Procedure, which permits a defendant to "reserv[e] in writing the right to have an appellate court review an adverse determination of a specified pretrial motion."  Fed. R. Crim. P. 11(a)(2).  Burrows contends that because the rule "speaks to a 'specified pretrial motion,'" he should be permitted to appeal all of the order denying suppression motion.  Burrows's argument fails because his plea agreement did not refer to the district court's order or to a

specified pretrial motion.  Rather, his plea agreement expressly and clearly referred to only the search of the vehicle on November 21.[9]

## III.  CONCLUSION

For the reasons discussed above, we affirm Burrows's conviction.

**AFFIRMED.**

---

[9]Even if the laptop-computer issue were not waived, Burrows has failed to show any error in the district court's order, which explained that the 17-day delay was not unreasonable in light of the "[n]umerous obstacles" the government encountered in obtaining the warrant, including a federal holiday, understaffing due to budget constraints, and difficulty obtaining an appointment with a magistrate judge.