NIEMEYER, Circuit Judge,
dissenting:
Baltimore City police officers concededly had probable cause to believe that heroin was being stored at and distributed from a building known as 2700 Tivoly Avenue in Baltimore. Relying on that probable cause and the exigent circumstances of possibly losing evidence, the officers entered the building; conducted a protective sweep of it; and detained two occupants until the officers were able to obtain a search warrant and search the building — a period of approximately three hours. As a result of the search, the officers found a revolver and ammunition in a room that one of the occupants, Prentiss Watson, acknowledged was his. Watson was indicted for being a felon in possession of a firearm and ammunition, in violation of 18 U.S.C. § 922(g)(1).
*700 Contending that he was detained without probable cause, in violation of his Fourth Amendment rights, Watson filed a motion to suppress statements he made to officers in which he identified the room that was his and denied the operability of the firearm found there, arguing that the statements were the fruit of an illegal detention and should be suppressed. The district court denied the motion, and a jury convicted Watson for the illegal possession of the firearm and ammunition.
The majority today vacates Watson’s convictions, concluding that without probable cause to seize Watson, his detention for the three-hour period during which police officers obtained a warrant and conducted the search was illegal. Ignoring the suspicion created by Watson’s presence in a building as to which officers had probable cause to believe was the site of criminal activity, see Michigan v. Summers, 452 U.S. 692, 703-04, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981), and the legitimate interests of law enforcement officers in detaining occupants of the building, see id. at 702-03, 101 S.Ct. 2587, the majority concludes that without probable cause as to whether Watson himself committed a crime, the police officers were required to release him after conducting an initial protective sweep of the building.
This alarming ruling vitiates the longstanding police practice of detaining occupants found in a building, for which probable cause exists, while a search warrant is obtained and the building is searched, and raises new barriers to the use of such law enforcement procedures. See, e.g., United States v. Cephas, 254 F.3d 488, 491, 495-96 (4th Cir.2001) (noting that law enforcement officers, who had made a justified warrantless entry into an apartment, detained eight or nine occupants while a search warrant was obtained). Other circuits likewise have recognized that police practice. See, e.g., United States v. Ruiz-Estrada, 312 F.3d 398, 404 (8th Cir.2002) (“The act of securing the apartment [including its two occupants] while awaiting a search warrant comports with the Fourth Amendment”); United States v. Limares, 269 F.3d 794, 799 (7th Cir.2001) (“The agents respected the privacy of those found within [the building] by securing the premises but not conducting a search until the [search] warrant had been issued. This is a model of good, even over-cautious, police work”).
With profound concern, I respectfully dissent.
I
Deputy Major Darryl DeSousa of the Baltimore City Police Department, along with other police officers, began conducting covert surveillance for drug trafficking in the 2700 block of Tivoly Avenue, Baltimore, at approximately 11:00 a.m. on February 23, 2010. DeSousa reported, “There was a lot going on in that block at the time.” Detective Richard Jamison, who was initially receiving radio reports from DeSousa, stated, “I got the impression that things happened quicker than anyone anticipated them happening, because we were trying to get [arrest teams] from everywhere we could due to the sheer volume of, I guess, purchasers, customers.” DeSousa’s observations included watching Leroy Smith escort several individuals to a position in an alley across the street from 2700 Tivoly Avenue, where Smith had them wait while he crossed the street and met with Anthony Jackson in the alley next to 2700 Tivoly Avenue. The building known as 2700 Tivoly Avenue was an end unit row house that had a front entrance on Tivoly Avenue and a side entrance on the alley. A convenience store was operated from the front of the first floor, and a storeroom was located at the *701 rear. Three bedrooms and a bathroom were located on the second floor. After Smith and Jackson spoke briefly, DeSousa observed Jackson enter 2700 Tivoly Avenue through the side door and emerge from the building a short time later, holding a plastic bag that he handed to Smith. Smith then went back across the street to hand small items from the plastic bag to the waiting individuals in exchange for cash. During the course of his observations, DeSousa observed Jackson go in and out of 2700 Tivoly Avenue “on a regular basis.”
Based on these observations, DeSousa directed several arrest teams to the area, and those teams, acting on DeSousa’s information, then began arresting purchasers who had left the site. At that time, they arrested Smith, Stanley Brody, and Bryan Crawford and, in connection with these arrests, recovered gel caps containing heroin.
As police officers arrived at 2700 Tivoly Avenue, DeSousa saw Jackson grab his waistband in a way that suggested he was armed. Jackson then ran into the side entrance of the building. A short time later, Jackson exited the building through the convenience store’s front door, and police arrested him as he was getting into his car. Upon frisking him, they did not ñnd a weapon.
Based on what had been observed and on the earlier arrests, the police concluded they had probable cause to believe that drugs were being distributed from the building. They decided to obtain a search warrant and, in the interim, to enter and secure the building to prevent the destruction of evidence. While Detective Jamison was obtaining the search warrant, a team of officers entered the building’s side entrance and followed standard police procedures to secure the building. Under those procedures, the officers were to “check every location a human being could be to make sure that we’re all safe, and we don’t have armed suspects in the house,” and they were to bring any individuals who they found on the premises to “a central location where they could be watched for everyone’s safety” until the warrant had been obtained and the investigation completed. Accordingly, as the officers entered the building, some went to the second floor to conduct the protective sweep and others to the convenience store on the first floor. There, Officer Reginald Parker and Officer Corey Jennings encountered Keta Steele, the building’s owner, and Prentiss Watson, who were working behind the counter. Officer Parker told Watson to sit down, and he advised both Steele and Watson of their Miranda rights, which they both said they understood. He also advised them that the police were seeking a warrant to search the building and that “we’re going to detain you until the warrant is actually prepared.”
In the meantime, Detective Jamison prepared the affidavit and the warrant application and took it to a judge in downtown Baltimore, where the judge signed the warrant at 3:34 p.m. Jamison then returned to 2700 Tivoly Avenue with the warrant, arriving there at 3:45 p.m. At that point, Officer Parker again read Steele and Watson their Miranda rights, and Detective Jamison went upstairs to assist in the search. In the back bedroom, officers recovered a shotgun and heroin, as well as a piece of mail with Watson’s name on it. In the front bedroom, the officers recovered marijuana, a revolver, several kinds of ammunition, and mail with Watson’s name on it. When Detective Jamison confronted Watson about the fact that his mail had been found in the back room where there was also a shotgun, Watson stated that he “just storefd] some stuff back there” and *702 that he did not “know anything about a shotgun.” Jamison also asked Watson where Jackson stayed, and Watson replied, “in the middle room.” And when Jamison asked Watson where he stayed, Watson stated, “the front room.” When Jamison later showed Watson the revolver and the ammunition taken from the room Watson had identified as his, Watson stated, referring to the revolver, “that old thing [doesn’t] even work.”
Watson was indicted in two counts, one for being a felon in possession of a firearm and one for being a felon in possession of ammunition, both in violation of 18 U.S.C. § 922(g)(1).
Watson filed a motion to suppress the statements that he made to the police while being detained. He argued that the police violated his Fourth Amendment rights when they detained him without probable cause during the period when they were obtaining the search warrant and searching the building and that his statements made during the course of the search were the product of his illegal detention. The district court denied Watson’s motion, concluding that “the temporary seizure ... was clearly supported by probable cause as to this building, and was designed to prevent the loss of evidence while the police diligently obtained a warrant in a reasonable period of time.” The court concluded that the detention lasted approximately three hours, finding that “[t]he warrant was approved as quickly as possible in light of the caseload that the state judges in Baltimore need to deal with” and referring to the “crisis in the criminal justice system in the courts of Baltimore City.” As an additional and alternative finding, the court concluded that Watson’s statements were in any event made voluntarily and not as a result of the allegedly illegal detention.
After a four-day trial, the jury convicted Watson on both counts, and the district court sentenced him to 31 months’ imprisonment on each count, to run concurrently.
On appeal, Watson challenges only the district court’s denial of his motion to suppress.
II
Watson contends that his three-hour detention was a seizure implicating the Fourth Amendment and that it was illegal because when officers detained him, they did not have probable cause to believe that he had committed a crime. He argues that therefore the statements he made during his detention were “the fruit of an illegal arrest” and should be suppressed.
The majority accepts Watson’s argument, focusing on the absence of probable cause as to Watson. The majority opinion states, “During the entire course of that three-hour detention, the police had no reason to believe that the detained individual was linked to any criminal activity, including the evidence sought in the search warrant application.” Ante, at 690. The majority then proceeds to adopt a new rule, holding that without probable cause, Watson could only be detained during the period of the initial protective sweep of the building and thereafter had to be released. As the majority explains, “At some point during Watson’s detention, likely dose to its inception, any potential threat that Watson posed to the officers’ safety had dissipated. Thus, at that point, any reasonable justification for continuing to detain Watson dissipated as well.” Ante, at 693 (emphasis added).
Unfortunately, this view — that without probable cause, Watson’s detention was not justified after the protective sweep was successfully accomplished — overlooks the reasonable suspicion that existed as to Watson. A reasonable suspicion undoubt *703 edly arises with respect to persons found in a building that is openly being used for drug distribution or as a drug stash house, and police officers cannot allay that suspicion by merely conducting a protective sweep. Thus, under the facts before us, the officers could have reasonably suspected at the time the detention commenced that Steele and Watson were using their position from behind the retail counter to assist in the distribution of the heroin that officers had taken from the previously arrested customers. Under the jurisprudence of Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the officers having this suspicion had a right to detain Steele and Watson, for a reasonable period, pending issuance of a search warrant and a search to confirm or allay their suspicion.
The majority’s position also overlooks numerous and substantial law enforcement interests that the police officers had in detaining Steele and Watson even after conducting a protective sweep. First, released occupants could destroy evidence at other locations linked, through a possible drug trafficking conspiracy, to evidence present in the secured building. Second, released occupants could arm themselves and, with others, return to the building, a risk not minor in a context where drugs and guns are possibly involved. Third, releasing occupants would frustrate the officers’ ability to arrest any occupant who might be inculpated as the result of the search. And fourth, by releasing occupants before the search of the building, the officers would be denied the potentially useful cooperation of the detainees when conducting the search. The Supreme Court has identified all of these interests as legitimate and important to law enforcement officers when securing a building as to which probable cause exists. See Summers, 452 U.S. at 702-03, 101 S.Ct. 2587.
All agree in this case that Baltimore City police officers had probable cause to believe that 2700 Tivoly Avenue was being used for the distribution of illegal drugs, as numerous persons were arrested after obtaining heroin from that location. The officers actually saw Jackson go in and out of the building, bringing drugs out for distribution to Smith and, ultimately, to customers, who were arrested with the heroin. All also agree that exigent circumstances justified the officers’ entry into the budding to secure the evidence pending the issuance of a search warrant. See, e.g., Cephas, 254 F.3d at 495 (noting that the factors justifying a warrantless entry based on exigent circumstances include “information indicating the possessors of the contraband are aware that the police are on their trail,” “the ready destructibility of the contraband,” and “the possibility of danger to police guarding the site” (internal quotation marks and citation omitted)). Finally, all agree that after making a lawful warrantless entry, the police were justified in conducting a “protective sweep” of the premises. See ante, at 693; cf. Maryland v. Buie, 494 U.S. 325, 337, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990) (noting that officers may conduct a “limited protective sweep” in furtherance of officer safety).
The question presented in this case is whether Watson’s presence in a building, where drug distribution was open and ongoing, objectively raised a suspicion as to him that was sufficient to detain him while obtaining a warrant and searching the building. I suggest that the law on this issue is clear, as are the routine police practices that implement such law: When probable cause exists that a building contains contraband and that ongoing criminal activity is taking place there and when exigent circumstances justify a warrantless entry, the officers have a right to secure the building and detain its occupants for *704 the period reasonably necessary to obtain a warrant and search the building. See Summers, 452 U.S. at 704-05, 101 S.Ct. 2587; Cephas, 254 F.3d at 491, 494-96; Ruiz-Estrada, 312 F.3d at 400-01, 404; Limares, 269 F.3d at 796-97, 799. The reasons were set forth in Summers.
In Summers, as police arrived at a house to execute a warrant to search for narcotics, they encountered Summers descending the front steps. The officers detained Summers, as well as seven other occupants of the house, without having individualized probable cause, while they searched the premises. Summers, 452 U.S. at 693 & n. 1, 101 S.Ct. 2587. The Supreme Court held that Summers’ seizure during the duration of the search was consistent with the Fourth Amendment, even though the Court assumed that his detention was unsupported by probable cause. Id. at 696, 705, 101 S.Ct. 2587.
The Court began its analysis by describing two categories of seizures approved by its precedents. First, it noted that there was “the general rule that every arrest, and every seizure having the essential attributes of a formal arrest, is unreasonable unless it is supported by probable cause.” Id. at 700, 101 S.Ct. 2587. At the same time, the Court also acknowledged the line of cases beginning with Terry, in which it had “recognizefd] that some seizures admittedly covered by the Fourth Amendment constitute such limited intrusions on the personal security of those detained and are justified by such substantial law enforcement interests that they may be made on less than probable cause, so long as police have an articulable basis for suspecting criminal activity.” Summers, 452 U.S. at 699, 101 S.Ct. 2587 (emphasis added). With respect to this second category of seizures, the Court stressed that “the exception for limited intrusions that may be justified by special law enforcement interests is not confined to the momentary, on-the-street detention accompanied by a frisk for weapons involved in Terry and Adams [v. Williams, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972)],” explaining that “[i]f the purpose underlying a Terry stop — investigating possible criminal activity — is to be served, the police must under certain circumstances be able to detain the individual for longer than the brief time period involved in Terry and Adams.” Summers, 452 U.S. at 700 & n. 12, 101 S.Ct. 2587; see also id. at 700 n. 12, 101 S.Ct. 2587 (noting that police may utilize “ ‘several investigative techniques ... in the course of a Terry-type stop,’ ” including detaining a suspect “ ‘while it is determined if in fact an offense has occurred in the area, a process which might involve checking certain premises’ ” (quoting 3 W. LaFave, Search and Seizure § 9.2, pp. 36-37 (1978))).
To determine whether Summers’ seizure was “controlled by the general rule” requiring probable cause or whether it could be justified as a Terry-type stop that satisfied the Fourth Amendment’s reasonableness standard absent probable cause, the Court examined “both the character of the official intrusion and its justification.” Summers, 452 U.S. at 701, 101 S.Ct. 2587. Assessing the nature of Summers’ seizure, the Court concluded that his detention “was substantially less intrusive than [a formal] arrest.” Id. at 702, 101 S.Ct. 2587 (internal quotation marks and citation omitted). In this regard, the Court noted that the “police had obtained a warrant to search [Summers’] house for contraband,” observing that the detention, “although admittedly a significant restraint,” was an “incremental intrusion on personal liberty” that was “surely less intrusive than the search itself.” Id. at 701, 703, 101 S.Ct. 2587. The Court also emphasized that the detention was unlikely to be “unduly prolonged in order to gain more information, *705 because the information the officers seek normally will be obtained through the search and not through the detention” and that Summers’ detention in his own residence during the course of the search “could add only minimally to the public stigma associated with the search itself and would involve neither the inconvenience nor the indignity associated with a compelled visit to the police station.” Id. at 701-02, 101 S.Ct. 2587.
Against the incremental intrusion associated with the detention, the Court posited three legitimate law enforcement interests advanced by detaining those present while a lawful search is conducted. First, there is an “obvious ... legitimate law enforcement interest in preventing flight in the event that incriminating evidence is found.” Summers, 452 U.S. at 702, 101 S.Ct. 2587. Second, “the orderly completion of the search may be facilitated if the occupants of the premises are present” because “self-interest may induce them to open locked doors or locked containers to avoid the use of force that is not only damaging to property but may also delay the completion of the task at hand.” Id. at 703, 101 S.Ct. 2587. And third, the detention of occupants serves to “minimiz[e] the risk of harm to the officers.” Id. at 702, 101 S.Ct. 2587. In this regard, the Court recognized that even though “no special danger to the police [was] suggested by the evidence in this record, the execution of a warrant to search for narcotics is the kind of transaction that may give rise to sudden violence or frantic efforts to conceal or destroy evidence,” emphasizing that “[t]he risk of harm to both the police and the occupants is minimized if the officers routinely exercise unquestioned command of the situation.” Id. at 702-03, 101 S.Ct. 2587.
Finally, the Court also considered “the nature of the articulable and individualized suspicion” to justify the seizure, concluding that “[t]he existence of a search warrant ... provides an objective justification for the detention” because “[t]he connection of an occupant” to a building that a judicial officer has approved searching for contraband “gives the police officer an easily identifiable and certain basis for determining that suspicion of criminal activity justifies a detention of that occupant.” Summers, 452 U.S. at 703-04, 101 S.Ct. 2587.* Although recognizing that a “prolonged detention[ ] might lead to a different conclusion in an unusual ease,” the Court nonetheless held that “a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted.” Id. at 705 & n. 21, 101 S.Ct. 2587 (emphasis added). Moreover, the Court did not limit this principle to a circumstance where the warrant had actually issued, but recognized that probable cause and exigent circumstances could likewise justify the detention of occupants. See id. at 700 n. 17, 101 S.Ct. 2587 (noting that “the fact that our holding today deals with a case in which police had a warrant does not, of course, preclude the possibility that comparable police conduct may be justified by exigent circumstances in the absence of a warrant”) (emphasis added).
The Court also clarified that the justification for detaining occupants of premises as to which probable cause exists was categorical, noting that “if police are to have workable rules, the balancing of the competing interests inherent in the Terry prin *706 ciple must in large part be done on a categorical basis — not in an ad hoc, case-by-case fashion by individual police officers” and observing that “[t]he rule we adopt today does not depend upon such an ad hoc determination, because the officer is not required to evaluate either the quantum of proof justifying detention or the extent of the intrusion to be imposed by the seizure.” Id. at 705 n. 19, 101 S.Ct. 2587 (internal quotation marks and citations omitted); see also Muehler v. Mena, 544 U.S. 93, 98, 125 S.Ct. 1465, 161 L.Ed.2d 299 (2005) (applying Summers to hold that an individual’s detention for up to three hours while police conducted a search was reasonable because she was an occupant of an address for which a search warrant had been issued at the time of the search); United States v. Photogrammetric Data Servs., Inc., 259 F.3d 229, 239 (4th Cir.2001) (relying on Summers to hold that because police were in possession of a valid warrant to search the premises of a business, officers “necessarily had authority to secure the premises and detain the employees temporarily in order to conduct the search with minimal interfei'ence”), abrogated on other grounds by Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).
Summers clearly guides our analysis here and directly supports the reasonableness of the police officers’ actions in this case. To be sure, the police in Summers had already obtained a search warrant when they appeared at Summers’ house. But the Court also noted that “comparable police conduct may be justified by exigent circumstances in the absence of a warrant.” Summers, 452 U.S. at 702 n. 17, 101 S.Ct. 2587. More importantly, the principles enunciated in Summers, while depending on probable cause as to criminal activity in the house, did not, in the end, hinge on the issuance of the warrant itself. Rather, the culpability of the premises, the nature of the intrusion, and the law enforcement interests implicated by the situation justified the detention.
Thus, under Summers’ reasoning, the temporary detention of those occupying premises that police have lawfully secured while awaiting a search warrant, although amounting to a seizure within the Fourth Amendment, is substantially less intrusive than a traditional, formal arrest that may only be justified by probable cause. See Summers, 452 U.S. at 701-02, 101 S.Ct. 2587. Given that the police had probable cause to believe that criminal activity was ongoing at 2700 Tivoly Avenue and that entry without a warrant was justified by exigent circumstances, detaining Watson and Steele at the scene in the interim was not an overbearing intrusion on their personal liberty. Indeed, many law-abiding citizens in Watson and Steele’s position would likely want to stay on the premises for a reasonable period of time to observe the officers stationed in their home and place of business. See id. at 701, 101 S.Ct. 2587. As such, the seizure at issue here was perhaps no more intrusive than the majority’s suggested alternative of removing Watson and Steele from the building and prohibiting their reentry. See ante, at 691-92.
Moreover, the additional intrusion caused by a temporary detention in these circumstances is justified by the same legitimate law enforcement interests implicated in Summers. Just like in Summers, the police here had a legitimate “interest in preventing flight [of the building’s occupants] in the event that incriminating evidence [was] found” and in ensuring that those present remain to facilitate “the orderly completion of the search” once it was authorized. Id. at 702-03, 101 S.Ct. 2587. And just like in Summers, the police had a substantial interest in minimizing the harm to officers that was inherent in securing a *707 building prior to a search for drugs and guns. See id. To allow those present when police secure a building to subsequently depart while the officers wait for the warrant would substantially increase the risk of harm to the police left guarding the site. Indeed, from an officer-safety perspective, police would find themselves in a much worse position than they faced before they had effected a lawful warrant-less entry to secure the building, becoming vulnerable to attack by those armed with knowledge regarding the number of officers on the scene and fortified by their desperation to keep the police from uncovering the contraband that officers have probable cause to believe is present.
And finally, the temporary detention of Watson and Steele was justified by the same type of “articulable and individualized suspicion” that supported the detention in Summers. Id. at 703, 101 S.Ct. 2587. The “connection of an occupant” to a building that the police have lawfully secured pending the issuance of a search warrant “gives the police officer an easily identifiable and certain basis for determining that suspicion of criminal activity justifies a detention of that occupant.” Summers, 452 U.S. at 703-04, 101 S.Ct. 2587. The majority misses this point, repeatedly asserting — presumably based on the officers’ testimony that they did not have any specific information relating to Watson when they entered the building — that the police did not suspect Watson of any criminal activity. But under the logic of Summers, the fact that Watson was an occupant of a building that police had probable cause to believe harbored heroin and served as a facility from which heroin was being openly distributed provided the police with reason to suspect Watson of participating in the ongoing criminal activity.
In sum, balancing the nature of the intrusion in this case against both the legitimate law enforcement interests and the articulable suspicion supporting the detention, the Baltimore City police acted reasonably when they temporarily detained the individuals occupying a place that officers had lawfully entered and secured.
Of course, this type of detention should not last “longer than reasonably necessary for the police, acting with diligence, to obtain the warrant.” Illinois v. McAr-thur, 531 U.S. 326, 332, 121 S.Ct. 946, 148 L.Ed.2d 838 (2001). But in the circumstances of this case, involving the preparation and obtaining of a warrant from a judge otherwise carrying a heavy criminal docket in a busy city courthouse, a three-hour detention was not unreasonable. See Mena, 544 U.S. at 98, 125 S.Ct. 1465 (approving a detention of three hours while police conducted a search).
Contrary to these governing principles, the majority establishes a new rule that police officers, finding occupants in a building as to which probable cause exists that contraband is being harbored and crime is being committed therein, must nonetheless release the occupants after completing the protective sweep. See ante at'693-94. In doing so, the majority completely overlooks: (1) the suspicion created by the very presence of the detained occupants in a building from which drugs were being distributed, (2) the risks the rule would cause to law enforcement officers, and (3) the legitimate benefits it would deny them. Because I conclude that Watson’s detention was reasonable, I would affirm.

 The majority apparently rejects this proposition in Summers, denying that a person’s presence in a building as to which probable cause of criminal activity exists "gives the police officer an easily identifiable and certain basis” for suspicion. See ante, at 705.