*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

ANDREW MACK JOHNSON, JR.,

        Defendant-Appellant.

UNPUBLISHED
February 27, 2020

No. 343497
Eaton Circuit Court
LC No. 2017-020019-FC

Before: FORT HOOD, P.J., and BECKERING and BOONSTRA, JJ.

PER CURIAM.

A jury convicted defendant, Andrew Mack Johnson, Jr., of first-degree premeditated murder, MCL 750.316(1)(a); first-degree felony murder, MCL 750.316(1)(b); second-degree murder, MCL 750.317; and safe breaking, MCL 750.531. The trial court entered a single conviction of first-degree murder supported by two different theories[1] and sentenced defendant to life imprisonment without parole for the first-degree murder conviction and to a term of 84 to 400 months for the safe breaking conviction. Defendant appeals as of right. Finding no error warranting reversal, we affirm.

## I. RELEVANT FACTS AND PROCEEDINGS

Defendant's convictions arise from the murder of John Abraham, Sr., in his home in Delta Township on July 4, 2016. The victim's son, John Abraham, Jr. (Junior), testified that he has cerebral palsy and requires assistance in all aspects of daily living. He has caregivers 18 hours per day, and has six to eight varying caregivers at a time. The victim and Junior would talk on the phone between 8:30 and 9:00 a.m. each day, and the victim would visit daily from 2:30 p.m. to 5:00 p.m. when no caregivers were scheduled. Both the victim and Junior liked to have cash on hand, and the victim kept Junior's cash in envelopes in drawers at the victim's home. The two often discussed finances and had discussions about money in the presence of Junior's caregivers. Dymond Squires was a regular caregiver from October 2012 until February 2016, and thereafter

---

[1] The trial court vacated the second-degree murder conviction.

worked as needed. Squires had been to the victim's home with Junior on one occasion during the summer of 2013. The victim's brother, Robert, also testified that he talked to the victim every day.

When the victim did not telephone Junior on the morning of July 5, 2016, Junior became concerned. When he did not come to Junior's house in the afternoon, Junior's caregiver drove him to the victim's home around 2:00 p.m., but the victim did not answer the door or respond to Junior's yells. Junior telephoned Robert, who went to the victim's home, but the victim did not answer the door. Junior next telephoned his cousin, Lori Gidley, around 4:00 or 5:00 p.m. Lori and her husband, Warrant, went to check on the victim. They discovered that the front door was unlocked, and when Warren opened the door he saw a body a few feet from the door. They noticed an indentation on the right side of the victim's head and thought that the victim had possibly fallen and hit his head on a credenza. They assumed the body was the victim, but his face was unrecognizable. Lori called 911.

Eaton County Deputy Andrew Jenkins was among the first responders to the call. He immediately realized that the victim's injuries did not appear to have been caused by a fall. The victim was positioned five feet inside the door and was lying on his back, he was bleeding heavily from the head and neck, and he had two large slits to his neck; there was brain matter on the carpet. A serrated knife was sticking out from under the victim's body. Deputy Jenkins cleared the house and performed a quick search before paramedics went inside.

After the paramedics entered the home, Deputy Jenkins did a more deliberate walkthrough. There were no signs of forced entry. There were several open kitchen cabinets and drawers. A broken screwdriver was observed in the back bedroom and a safety deposit box was on the bathroom counter. Deputy Jenkins discovered that a safe had been broken open in the basement. In powder that appeared to be from the fire-retardant material lining the safe, Jenkins observed two sets of shoe prints—one larger and one smaller, with two different patterns. Jenkins also observed a hatchet cover on a shelf. As a result of the initial scene investigation, Detective Theodore Johnson determined that there were at least two suspects involved in the crimes and, given the differing size of the shoe prints, he believed one was male and one was female.

The Eaton County Medical Examiner, Dr. Michael Markey, performed an autopsy on the victim on July 6, 2016. Dr. Markey testified at defendant's trial that the victim's injuries were mainly to the head and neck; he explained the injuries using seven autopsy photographs. The victim suffered multiple blunt force blows to his head from an item such as a bat or hammer and sharp force injuries to his neck. The victim had obvious multiple skull fractures, the skull was fragmented, and parts of the brain were lacerated. Dr. Markey opined that the cause of death was blunt and sharp force injuries to the head and neck and that the manner of death was homicide. He explained that significant force was required to cause the injuries. On July 7, Dr. Markey asked Dr. Joseph Hefner, an assistant professor of anthropology at Michigan State University, to assist in determining timing of injury and mechanism of injury because of the extensive fragmentation of the skull. Dr. Hefner reconstructed most of the skull using the 85 fragments supplied by Dr. Markey. He located 11 blunt force injuries and said that the deformation of the skull was indicative of being struck by a small circular to ovoid implement, such as a hammer, traveling 2,200 feet per second.

Detective Johnson testified that he learned during interviews with Lori Gidley and Junior that the victim was paranoid, that Junior had multiple caregivers, and that the caregivers likely knew that the victim had a lot of cash in his home. Because the victim's house was not ransacked and there was no sign of forced entry, and because the caregivers were aware of the cash in the victim's home, Detective Johnson believed that the motive for the murder was money, the victim was a target, and that one of the caregivers was likely involved.

Subsequently, Detective Johnson interviewed between 15 and 18 of Junior's caretakers and collected DNA from all of them. His interview with Squires on July 8 raised his suspicion that Squires had knowledge of, or involvement in, the crimes, and so he interviewed her a second time. Detective Johnson learned that Squires had a boyfriend, but he did not know the boyfriend's name. After Squires failed a polygraph examination and was interviewed by the polygraph examiner on July 21, 2016, officers began surveillance on Squires that day. By this time, Johnson had met with Dr. Hefner and, based on what he learned from Dr. Hefner, believed a hammer was used to cause the victim's head injuries.

During surveillance, officers observed Squires drive to a residence on Aurelius Road in Lansing and then leave the residence with a larger male. The two got into a red Kia that was parked in the driveway and drove off with Squires driving. The Kia drove to a Meijer parking lot and was observed "cleaning," which is a series of turns or other unusual driving maneuvers in an attempt to determine if the vehicle is being followed. The evasive behavior was significant to Detective Johnson because Squires and a larger accomplice were suspects in the murder.

A search warrant was obtained the same day for the Aurelius Road residence to search for proof of residency and for shoes matching the shoe prints from the victim's basement. Squires and defendant were present inside the residence and were both detained while officers executed the search warrant. During the search, two different sizes of shoes, one larger and one smaller, were found in the bedroom. The shoes had soles with patterns similar to the shoe prints left in the powder in the victim's basement. Two hammers were also found. One of the hammers was found on the top shelf of a closet, and the hammers were the only tools found in the residence.

While the search was ongoing, detectives interviewed Kyara Gendreau, Squires' and defendant's roommate. Gendreau said that unbeknownst to her, Squires had not been paying rent, and that she learned from the landlord after July 5 that the rent had been paid up-to-date. She also said that after July 5 there was a new air conditioner and a lot of alcohol and "weed" in the home, and someone had been hired to clean the basement. The landlord, Paulina Rodriguez, testified that Squires sent her a text message at 8:20 a.m. on July 5, 2016, informing her that the overdue rent was being paid. A cash deposit of $3,125, the exact amount of rent owing, was deposited into her credit union account by Squires.

During the search of the Aurelius Road residence, an amended search warrant was obtained for Squires' car and for additional items inside the residence. During that search, firearms and a large amount of cash bundled in hair ties were found in the trunk.

On July 23, 2016, while defendant was being detained for the victim's murder, Detective Johnson met with defendant to execute a DNA search warrant. During the execution of the warrant, defendant asked about the investigation. Detective Johnson testified that he read

-3-

defendant his *Miranda*[2] rights. Defendant waived his *Miranda* rights and, during a three-hour recorded interview,[3] defendant described his and Squires' plans to rob the victim, made statements about their poor economic situation, made statements about his involvement in the theft and murder, and said that he and Squires had stolen nearly $30,000 from the victim's safe. Defendant asserted that Squires caused the victim's injuries and he attributed the murder to her. He said that Squires had a hammer and that he came out of the basement to find her holding the hammer and saying that she struck the victim four or five times. Defendant also said that Squires slit the victim's throat twice and struck him in the head with a crowbar. Defendant said that after cleaning up the scene, he and Squires went home, put their clothes and shoes into a bag, and then went to an apartment complex to dispose of them in a dumpster. Next, they drove to the river near Olympic Broil in north Lansing and threw the instruments used during the crime into the river. According to Detective Johnson, a dive team recovered a hatchet and a knife from the area where defendant said the instruments were disposed. The Michigan State Police Crime lab matched the tool mark on the hinge area of the safe to the hatchet recovered from the river.

Zachary Burns, a Michigan Department of Corrections inmate, testified that while he was lodged in the Eaton County jail defendant told him that he went into a man's house with Squires, punched him, and knocked him out.[4] Defendant told him that the man saw his face so he had to kill him with a hammer hit to the head. Defendant said that he then took money from a safe in the basement and that when he came back upstairs he thought the man was still moving so he used a knife to cut the man's throat.

Detective Aaron Roberts analyzed the cell phones retrieved during the search of the Aurelius Road residence. He said that on June 8, 2016, defendant's phone performed a search for "silencers," and on June 9 it performed a search for silencers and "how to break into a house." On June 10, defendant's phone performed a search for "how to break into a house quietly." On June 13 and 14, there were searches for "definition of homicide." Squires' phone contained a search for "break a neck by hand." Location services was turned "on" on Squires' phone, and the analysis of the locations where her phone traveled between 8:41 p.m. on July 5 and 5:12 a.m. on July 6 was consistent with the version of events provided by defendant in his confession.

After the prosecution rested, defendant moved for a directed verdict, which the trial court denied. The defense presented no witnesses. The jury convicted defendant and the trial court sentenced him as noted above.

---

[2] *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

[3] The interview was played in its entirety for the jury.

[4] Burns testified that defendant told him Squires had worked for the man and that the man willingly opened the door and allowed them inside when Squires said that she had to use the telephone because her car had broken down.

## II. ANALYSIS

## A. SUPPRESSION OF UNLAWFULLY OBTAINED EVIDENCE

Defendant contends that the trial court erred by denying his motion to suppress statements he made while in police custody because the police lacked probable cause to arrest him. He also contends that he suffered a violation of his rights under *Miranda* because the police did not advise him of his rights upon his arrest. Neither claim of error has merit.

We review a trial court's decision on a motion to suppress evidence de novo, and its findings of fact for clear error. *People v Woodard*, 321 Mich App 377, 382-383; 909 NW2d 299 (2017). A trial court's findings of fact are clearly erroneous when this Court is left with a definite and firm conviction that the trial court made a mistake. See *People v Johnson*, 502 Mich 541, 565; 918 NW2d 676 (2018). Because defendant did not raise a violation of his *Miranda* rights in the trial court, this issue is unpreserved, and our review is for plain error that affected the defendant's substantial rights. *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999).

The Fourth Amendment of the United States Constitution guarantees the right of the people to be secure against unreasonable searches and seizures. US Const, Am IV. The Michigan Constitution guarantees the same rights. Const 1963, art 1, § 11. "The lawfulness of a search or seizure depends on its reasonableness." *People v Nguyen*, 305 Mich App 740, 751; 854 NW2d 223 (2014) (citation and quotation marks omitted.) Generally, seizures require probable cause. *Id*. at 751-752. However, the United States Supreme Court has held that officers executing a search warrant for contraband have the authority "to detain the occupants of the premises while a proper search is conducted." *Michigan v Summers*, 452 US 692, 705; 101 S Ct 2587; 69 L Ed 2d 340 (1981); see also *People v Zuccarini*, 172 Mich App 11, 13-14; 431 NW2d 446 (1988). This initial detention constitutes a seizure within the meaning of the Fourth Amendment when the record demonstrates, as it does in this case, that defendant was not free to leave while the officers were searching his home. *Summers*, 452 US at 696.

The United States Supreme Court has held that "for Fourth Amendment purposes . . . a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." *Summers*, 452 US at 705. The Court reasoned that such detentions were proper because of the legitimate law enforcement interests at stake, including the interest in preventing flight, minimizing the risk of harm to the officers and the occupants, and having the occupants present to facilitate the orderly completion of the search. *Id*. at 701-702. Further, "[a]n officer's authority to detain incident to a search is categorical; it does not depend on the quantum of proof justifying detention or the extent of the intrusion to be imposed by the seizure." *Muehler v Mena*, 544 US 93; 125 S Ct 1465; 161 L Ed 2d 299 (2005). That the person detained may not be a suspect does not change the analysis; rather, "*Summers* makes clear that when a neutral magistrate has determined police have probable cause to believe contraband exists, '[t]he connection of an occupant to [a] home' alone 'justifies a detention of that occupant.' " *Muehler*, 544 US at 100 n 2, quoting *Summers*, 452 US at 703-704. In addition, "*Summers*' authorization to detain an occupant of the place to be searched" carries with it "the authority to use reasonable force to effectuate the detention." *Muehler*, 544 US at 98-99. "The test of reasonableness under the Fourth Amendment is an objective one. . . . Unreasonable actions include the use of excessive force or restraints that cause unnecessary pain

or are imposed for a prolonged and unnecessary period of time." *Los Angeles Co v Rettele*, 550 US 609, 613-614; 127 S Ct 1989; 167 L Ed 2d 974 (2007) (citations omitted).

Turning to the present case, the initial search warrant authorized the officers to search for evidence of residency and footwear. An amended search warrant obtained while the search was ongoing authorized the officers to additionally search Squires' car, and to additionally search the car and residence for evidence of articles of clothing or other objects that might contain bodily fluid from the victim, objects that would fit the description as having a shape likely to have made injury to the victim, firearms and ammunition, electronic storage devices, and cash suspected to be from the victim's residence.[5] Pursuant to *Summers*, during the execution of the search warrant, police had the authority to detain individuals with a connection to the premises for purposes of their safety and the efficacy of the search. *Rettele*, 550 US at 609; *Muehler*, 544 US at 100 n 2; *Summers*, 452 US at 703-704. Here, defendant had a connection to the premises as he was at the home when police arrived to conduct the search. Thus, police had the authority to detain him during the search. *Muehler*, 544 US at 100. Because the police were investigating a brutal murder, it was not unreasonable for the police to detain the occupants of the home, nor was it unreasonable for the police to detain the occupants in handcuffs. *Id*.; see *Rettele*, 550 US at 613-614.

Citing *Dunaway v New York*, 442 US 200; 99 S Ct 2248; 60 L Ed 2d 824(1979), defendant argues that, even if his detention inside the house was reasonable as an initial matter, the detention escalated to a formal arrest without probable cause when he was removed from the home and placed into the backseat of a police car approximately ½ hour after the search commenced, and then taken to a detention cell at the police department an hour later and held until the search was concluded. Even assuming, however, that defendant was illegally arrested when he was removed from the home and taken to the police station for the duration of the search, the issue would be whether police obtained defendant's confession as a result of the unlawful arrest. Intervening circumstances break the causal connection where police have "uncovered evidence sufficient to establish probable cause to arrest the defendant before the challenged custodial statement was given." *People v Kelly*, 231 Mich App 627, 635; 588 NW2d 480 (1998). In *Kelly*, this Court noted:

> Other courts have held that a custodial confession following an illegal arrest need not be suppressed if the police have uncovered evidence sufficient to establish probable cause to arrest the defendant before the challenged statement was given. Under such circumstances, " 'one could question the wisdom of requiring police to go through the formality of releasing [the defendant], only to rearrest him outside the jailhouse door.' " [*Kelly*, 231 Mich App at 635 (citations omitted).]

Probable cause to arrest exists when the "facts available . . . at the moment of the arrest would justify a fair-minded person of average intelligence in believing that the suspected person had committed a felony." *Nguyen*, 305 Mich App at 751-752 (quotation marks and citation

---

[5] Contrary to defendant's implication, the affidavit for the amended search warrant did not include any evidence obtained from defendant's conversation with Squires while in the backseat of the police car.

omitted). "Probable cause requires only a probability or substantial chance of criminal activity, not an actual showing of criminal activity. Circumstantial evidence, coupled with those inferences arising therefrom, is sufficient to establish probable cause . . . ." *Id*. at 752 (quotation marks and citations omitted).

Here, there were numerous facts and circumstances within police knowledge that were sufficient to warrant a reasonable person to believe that defendant was involved in the victim's murder. Before the execution of the search warrant, distinct shoe prints left in the dust in the basement indicated the involvement of two people, and suggested that one was male and the other female. At a time when detectives knew that a safe had been broken into at the crime scene and that a large amount of cash was believed to have been taken from the safe, Squires indicated in interviews with investigators prior to July 21, 2016, that she and her boyfriend were having financial difficulties. Detectives were also aware that Squires had failed a polygraph examination regarding the murder, and that after Squires' interview on July 21, 2016, she went to her residence, where she later left with defendant in a vehicle that was being surveilled while she drove in a manner consistent with "cleaning."

During the execution of the search warrant, officers found shoes in defendant's bedroom that appeared consistent in size and tread pattern with both sets of shoe prints that were left in the safe insulation dust in the basement. The police also located two hammers that appeared to be capable of causing the injuries to the victim's head based on their size and shape. In addition, detectives interviewed the pair's roommate during the execution of the search and learned that defendant and Squires had formerly been hard-up for money, but had recently purchased an air conditioner and had paid $400 to have the basement cleaned, and that Squires had paid $3,125 in unpaid rent to the landlord. Even if the discovery of the shoes together with the information known to police before the search was not enough to support probable cause for arrest at the time defendant was taken to the police station during the search, all of these facts, taken together and judged from the totality of the circumstances, were enough to support probable cause for arrest by the time the officers concluded the search.

Given all the information available to police at that time, a prudent person would believe that defendant had committed murder or was involved in the murder of the victim. Defendant's confession occurred two days later, on July 23, 2016. Consequently, even assuming that defendant was illegally arrested when he was removed from the home, placed into a police car, and taken to the police department for the duration of the search, defendant's confession was sufficiently attenuated from any unlawful arrest such that it was purged of the taint of the unlawful arrest, and therefore, the trial court did not err by denying defendant's motion to suppress his confession and evidence discovered as a result of that confession.

Defendant also argues that his constitutional rights were violated because the police failed to advise him of his *Miranda* rights upon his arrest. Defendant fails to cite any authority requiring police officers to mirandize a suspect immediately upon arrest or risk violating the arrestee's rights under *Miranda*. In *Miranda*, the United States Supreme Court held that the Fifth Amendment's prohibition against compelled self-incrimination requires that the accused be given a series of

warnings before being subjected to "custodial interrogation."[6]  *Miranda*, 384 US at 444. Defendant conceded during the hearing on the motion to suppress that he was given his *Miranda* warnings before he was interrogated and that his statement was voluntary.  Thus, defendant has failed to show plain error.

## B.  JURY INSTRUCTIONS

Defendant observes that the trial court did not initially instruct the jury that aiding and abetting applied to first-degree premeditated murder, and that the trial court erred by affirming that it did in response to a jury question during deliberations.  In so doing, defendant argues, the court permitted the jury to apply facts to a theory not provided to them in the original instructions and denied him the ability to present counterarguments to the theory on that charge.  Defendant also argues that the aiding and abetting instruction was not warranted for the felony murder charges because there was insufficient evidence supporting the instruction.  Again, we find no error.

We review de novo a claim of instructional error involving a question of law, but we review for an abuse of discretion the trial court's determination that a jury instruction is applicable.  *People v Craft*, 325 Mich App 598, 604; 927 NW2d 708 (2018).  A trial court abuses its discretion when its decision falls outside the range of reasonable and principled outcomes.  *Id*.  However, where a party expresses satisfaction with the instructions given the jury by the trial court, any issues of instructional error are waived.  *People v Carter*, 462 Mich 206, 213-216; 612 NW2d 144 (2000). An explicit and repeated approval of an instruction constitutes waiver.  *People v Kowalski*, 489 Mich 488, 503; 803 NW2d 200 (2011).  Where an issue is waived, any error is "extinguished" and review by this Court is precluded.  *Carter*, 462 Mich at 215-216.

Although defense counsel opposed application of an aiding and abetting theory to first-degree premeditated murder when the issue arose, he did not object to application of the theory to felony-murder.  In fact, he stated that he was satisfied with the final jury instructions before they were read to the jury and again after the final jury instructions were read to the jury.  Therefore, defendant has waived his argument that the trial court erred by instructing the jury on aiding and abetting the crime of felony murder.

During deliberations, the jury sent a note to the court asking whether aiding and abetting applied to first-degree premeditated murder.  Defense counsel argued that the prosecution did not bring forth that theory during its case-in-chief, and it was too late to apply it at this juncture.  The prosecutor argued that the prosecution "presented an aiding and abetting theory throughout the entire trial on open murder," and that an aiding and abetting instruction was applicable to first-degree premeditated murder.  The court found that the aiding and abetting instruction applied to the charge of first-degree premeditated murder, and instructed the jury as such.

---

[6] The United States Constitution and the Michigan Constitution both prohibit "compelled" self-incrimination.  US Const, Am V ("No person shall . . . be compelled in any criminal case to be a witness against himself . . ."); Const. 1963, art 1, § 17 ("No person shall be compelled in any criminal case to be a witness against himself . . .").

"Mere error alone in instructing the jury is insufficient to set aside a criminal conviction. Instead, a defendant must establish that the erroneous instruction resulted in 'a miscarriage of justice.' " *People v Schaefer*, 473 Mich 418, 441-442; 703 NW2d 774 (2005), quoting MCL 769.26 ("No judgment or verdict shall be set aside or reversed or a new trial be granted by any court of this state in any criminal case, on the ground of misdirection of the jury . . . unless in the opinion of the court, after an examination of the entire cause, it shall affirmatively appear that the error complained of has resulted in a miscarriage of justice."). The jury unanimously found defendant guilty of first-degree premeditated murder, second-degree murder, and first-degree felony murder. The trial court vacated the conviction for second-degree murder, leaving convictions for first-degree premeditated murder and felony murder. Even if we assume for the sake of argument that the trial court erred by instructing the jury that the aiding and abetting instruction applied to premeditated murder, the felony murder verdict alone is sufficient to result in a conviction of a single count of first-degree murder. Because the court's instruction did not result in a miscarriage of justice, we find no reversible error.

## C. PROSECUTORIAL MISCONDUCT

Defendant argues that he was denied a fair trial when the prosecutor vouched for the credibility of Burns, who was the sole witness to provide evidence that it was defendant, and not Squires, who struck and killed the victim, and when the prosecutor asked the jury to sympathize with the victim and his family. He asserts that the prosecutor's conduct was clearly improper and constitutes plain error that could not be cured by a cautionary instruction. Once again, we disagree. Because this issue comes to the Court unpreserved, our review is for plain error affecting defendant's substantial rights. *People v Norfleet*, 317 Mich App 649, 660 n 5; 897 NW2d 195 (2016).

Defendant argues that the prosecutor unfairly vouched for the credibility of Burns during closing argument. A prosecutor may not "vouch for the credibility of his witnesses to the effect that he has some special knowledge concerning a witness's truthfulness." *People v Bahoda*, 448 Mich 261, 276; 531 NW2d 659 (1995). Further, the prosecutor may not vouch for a witness's credibility based on an assertion of the prosecutor's integrity or the prestige of the position. *People v McGhee*, 268 Mich App 600, 633; 709 NW 2d 595 (2005). But a prosecutor may argue that a witness is credible. *Id*.

The portrait defense counsel painted of Burns in his opening statement was of a convicted criminal who was testifying merely because he wanted a sentencing deal. Counsel argued that Burns' conviction for armed robbery weighed against his credibility and stated that Burns was "a liar," who was testifying to something defendant purportedly said months after defendant "gave his truthful confession to Detective Johnson at the Eaton County Jail."

In his closing argument, the prosecutor observed that much had been said about whether Burns was telling the truth. He admitted that Burns had asked for a sentencing deal, but had not received one, that he had put himself in the precarious position of being a jailhouse snitch by testifying, that Burns described much the same incident as defendant recounted, and that his description made sense. The prosecutor also emphasized that the jury was going to have to decide for itself whether to believe defendant or to believe Burns.

Our review of the record leads us to conclude that the prosecutor's statements were likely made in response to statements made by defense counsel during the opening statement regarding Burns' credibility. Given defense counsel's position that Burns was motivated to lie because he wanted a sentencing deal, it was proper for the prosecutor to respond to the claim and point out that Burns did not get any consideration for his testimony. And because there was conflicting evidence and the question of defendant's guilt depended on which witnesses the jury believed, the prosecutor properly commented on Burns' testimony related to credibility.

Defendant also argues that the prosecutor improperly appealed to the jury to sympathize with the victim and his son. A prosecutor may not ask jurors to sympathize with the victim in order to suspend their judgment and find a defendant guilty regardless of the evidence. *People v Hoffman*, 205 Mich App 1, 21-22; 518 NW2d 817 (1994).

Defendant cites the following statement in support of his argument: "In a little over four hours John Abraham, Sr. should go stay with John Abraham, Jr. for a couple hours during a gap in his care: at 2:30. Probably right about now, he should be calling and leaving a message for John, Jr. He can't. He can't because of need and greed of the defendant's actions." Defendant contends that this statement was a "blatant appeal to the jury's emotions." We disagree. The prosecutor's statement was a factually accurate recitation of the evidence presented at trial regarding the victim's regimented behavior, and it led into the prosecutor's argument that the victim was killed because defendant and Squires wanted his money. The prosecutor followed up the statement by arguing that that defendant knew when he went to the victim's home that the victim "was going to be seriously injured or murdered just to get some money." Viewed in the context of the prosecutor's entire closing, it does not seem to us that the prosecutor was asking jurors to suspend their judgment and convict defendant based on their emotions. The prosecutor's remarks were based on facts elicited at trial and were not so inflammatory as to prejudice defendant. Further, any error in the prosecutor's statement could have been cured by a cautionary instruction. *People v Solloway*, 316 Mich App 174, 201; 891 NW2d 255 (2016).

Finally, defendant argues that if neither instance of alleged prosecutorial misconduct is sufficient to warrant reversal, reversal is warranted by their cumulative effect. Finding no error, we find no cumulative error. Therefore, defendant's argument fails.

E. PHOTOGRAPHIC EVIDENCE – INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant next contends that the trial court erred by admitting into evidence the gruesome close-up autopsy photographs, and that their admission was more prejudicial than probative, particularly where testimonial evidence established the nature of the victim's death. Defense counsel stipulated to admission of the photographs; therefore, this issue is waived, any error extinguished, and appellate review precluded. *Carter*, 462 Mich at 214-216.

Alternatively, defendant argues that his trial counsel's stipulation to admission of the photographs constituted ineffective assistance of counsel. Generally, the determination whether a defendant has been deprived of the effective assistance of counsel presents a mixed question of fact and constitutional law. See *People v Trakhtenberg*, 493 Mich 38, 47; 826 NW2d 136 (2012).

Defendant filed a motion to remand for a *Ginther*[7] hearing in this Court, which we denied.[8] Our review, therefore, is "limited to mistakes apparent on the record." *People v Payne*, 285 Mich App 181, 188; 774 NW2d 714 (2009).

To establish the right to a new trial premised on ineffective assistance of counsel, a defendant must show that: (1) counsel's performance fell below an objective standard of reasonableness under prevailing professional norms; and, (2) there is a reasonable probability that, but for counsel's error, the result of the proceedings would have been different. See *Smith v Spisak*, 558 US 139, 149; 130 S Ct 676; 175 L Ed 2d 595 (2010); *Trakhtenberg*, 493 Mich at 51. This Court reviews de novo whether a particular act or omission fell below an objective standard of reasonableness under prevailing professional norms and prejudiced the defendant. *People v Gioglio (On Remand)*, 296 Mich App 12, 19-20; 815 NW2d 589 (2012), vacated not in relevant part, 493 Mich 864 (2012).

The gruesomeness of photographs, alone, does not mandate exclusion. *People v Mills*, 450 Mich 61, 76; 537 NW2d 909 (1995). "The proper inquiry is always whether the probative value of the photographs is substantially outweighed by unfair prejudice." *Id*.

> Photographs that are merely calculated to arouse the sympathies or prejudices of the jury are properly excluded, particularly if they are not substantially necessary or instructive to show material facts or conditions. If photographs which disclose the gruesome aspects of an accident or a crime are not pertinent, relevant, competent, or material on any issue in the case and serve the purpose solely of inflaming the minds of the jurors and prejudicing them against the accused, they should not be admitted in evidence. However, if photographs are otherwise admissible for a proper purpose, they are not rendered inadmissible merely because they bring vividly to the jurors the details of a gruesome or shocking accident or crime, even though they may tend to arouse the passion or prejudice of the jurors. Generally, also, the fact that a photograph is more effective than on oral description, and to the extent calculated to excite passion and prejudice, does not render it inadmissible in evidence. [*Id*. at 77 (quotation marks and citations omitted).]

In this case, the prosecution used the challenged photographs to both supplement and corroborate testimony concerning the nature, type, and location of the victim's injuries. This Court has approved the use of autopsy photographs for these purposes. See *People v Unger*, 278 Mich App 210, 257; 749 NW2d 272 (2008); see also *People v Ho*, 231 Mich App 178, 188; 585 NW2d 357 (1998) (holding that admission of gruesome photographs was proper where there was a legitimate purpose other than arousing the sympathies or prejudices of the jury). Because the photographs were relevant to the nature, type, and location of the victim's injuries, it is likely that the trial court would have admitted the contested photographs even over an objection. Thus, counsel was not ineffective for failing to object to admission of the autopsy photos. See *People v*

---

[7] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

[8] *People v Johnson*, unpublished order of the Court of Appeals, entered August 30, 2019 (Docket No. 343497).

*Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010). ("Failing to advance a meritless argument or raise a futile objection does not constitute ineffective assistance of counsel."). Further, even if we assume that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, considering the prosecution's overwhelming direct evidence of defendant's guilt, defendant has not established that the outcome of the trial would have been different but for counsel's deficient performance.

## E. STANDARD 4 BRIEF

In a Standard 4 brief,[9] defendant argues that the affidavit in support of the first search warrant contained false statements that were made in reckless disregard of the truth, without which, probable cause to issue the search warrant would have been lacking. Defendant further argues that because the false statements supply the only facts sufficient for a finding of probable cause, the warrant is fatally defective and the resulting search warrant is invalidated. Suppression of all evidence obtained as a result is appropriate and the good-faith exception does not apply. Moreover, the additional search warrants obtained as a result of the execution of the initial search warrant are unlawful. Because defendant did not challenge the validity of the search warrant in the trial court, this issue is not preserved, and our review is limited to plain error affecting defendant's substantial rights. *Carines*, 460 Mich at 762-763.

A search warrant may only be issued upon a showing of probable cause. US Const, Am IV; Const 1963, art 1, § 11; MCL 780.651(1). "Probable cause sufficient to support issuing a search warrant exists when all the facts and circumstances would lead a reasonable person to believe that the evidence of a crime or the contraband sought is in the place requested to be searched." *People v Ulman*, 244 Mich App 500, 509; 625 NW2d 429 (2001) (quotation marks and citation omitted). The magistrate's findings of probable cause must be based on the facts related within the affidavit. MCL 780.653; *Ulman*, 244 Mich App at 509. A defendant may be entitled to have a warrant voided when the warrant affiant's statements were deliberately false or made in reckless disregard for the truth and the affidavit's remaining content is insufficient to establish probable cause. *Franks v Delaware*, 438 US 154, 156; 98 S Ct 2674; 57 L Ed2d 667 (1978). The burden rests on the defendant to establish by a preponderance of the evidence that the affidavit contains a reckless or deliberate falsehood and that with this material "set to one side, the affidavit's remaining content is insufficient to establish probable cause." *Franks*, 438 US at 156.

Defendant argues that two statements in the search warrant affidavit are false: (1) that in an interview of Squires conducted on July 21, 2016, she made statements suggesting she was involved in the crime, and (2) that Squires stated to the polygraph examiner, MSP Detective-Sergeant Derrick Jordan, "that she did not know everything and that was all she was going to say at this point." According to the affiant, Detective Aaron Roberts, these statements were related to him by Detective Johnson.

---

[9] A "Standard 4" brief refers to the brief a defendant may file in propria persona pursuant to Standard 4 of Michigan Supreme Court Administrative Order No. 2004-6, 471 Mich c, cii (2004).

Since Detective Roberts was stating what he was told by Detective Johnson, defendant has failed to make any showing that the *affiant's* statements were deliberately false or make in reckless disregard of the truth. And, as the Supreme Court emphasized in *Franks*, 438 US at 171, "[t]he deliberate falsity or reckless disregard whose impeachment is permitted . . . is only that of the affiant." Therefore, if Detective Johnson, who observed the interview, did not accurately convey Squires' statements to the affiant, or if the affiant carelessly misrepresented what he was told, defendant has failed to establish *deliberate* falsity or *reckless* disregard for the truth.

Further, even if those two statements are eliminated from the warrant affidavit, there was still "sufficient content in the warrant affidavit to support a finding of probable cause." *Franks*, 438 US at 172. The initial search warrant affidavit that defendant challenges sought a search warrant to discover documentation that would show occupancy of the residence to which they had followed Squires after the interview. It also sought the right to discover and seize "[s]hoes, boots, and other footwear." The affidavit described how the police had followed Squires after the interview as she drove directly to the address they sought to search. It then described how Squires subsequently emerged from the home with an unknown male and an unknown female; the male was described as being larger than the female. The affidavit then described how Squires drove away in an "erratic fashion" and apparently attempted to elude anyone who might be following her. The affidavit then described a series of facts about the victim's possession of a large amount of cash in a safe in his house: the victim's son had told his caregivers that the victim had a large amount of money in his house; that Squires' telephone number was listed in the contacts list of the victim's cell phone; that Squires was one of the son's caregivers; that Squires had admitted that she had been in the victim's home; that footwear impressions were found in the dust from the safe's fire-retardant lining that was found on the floor around the safe; and that one of the prints was larger than the other one—indicating that the robbery had been committed by two separate individuals. The police thus sought entry to the subject home to find footwear that might have been worn during the robbery/murder. These stated facts were sufficient to establish probable cause to suspect that footwear worn by the murderer(s) might be found in the subject home. Thus, even if the two challenged allegations of the affiant are removed, the remainder of the allegations established sufficient probable cause to support the search warrant.

Finally, defendant argues that his trial counsel's failure to challenge the validity of the warrant and the veracity of the affidavit constituted ineffective assistance. However, because defendant has failed to establish any invalidity in the warrant affidavit, and because there is sufficient probable cause even if the challenged statements are stricken from the affidavit, there is no valid claim of ineffective assistance of counsel, as there is no possible outcome-determinative error.

## III. CONCLUSION

We conclude that the trial court did not abuse its discretion by denying defendant's motion to suppress; that even if we assume instructional error regarding the application of an aiding and abetting theory to first-degree premeditated murder, the error was harmless; that the prosecutor did not commit prosecutorial misconduct and any prejudice arising from his comments could have been cured by a curative instruction; that defense counsel was not ineffective for stipulating to admission of the autopsy photographs because they served a permissible purpose, that any prejudice caused by their admission did not substantially outweigh their probative value, and that,

-13-

given the prosecution's overwhelming direct evidence of defendant's guilt, defendant cannot show that, but for counsel's alleged deficient performance, the outcome of the trial would have been different; that the initial search warrant was valid, and that even without the statements to which defendant objects, the affidavit upon which the search warrant was based established sufficient probable cause to support the search warrant.

Affirmed.

/s/ Karen M. Fort Hood
/s/ Jane M. Beckering
/s/ Mark T. Boonstra